**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-1237**

FELICIA STROTHERS,

Plaintiff - Appellant,

v.

CITY OF LAUREL, MARYLAND, (Mayor & City Council),

Defendant - Appellee.

Appeal from the United States District Court for the District of Maryland, at Greenbelt.
Paul W. Grimm, District Judge. (8:14-cv-03594-PWG)

Argued: March 21, 2018                          Decided: July 6, 2018

Before GREGORY, Chief Judge, DIAZ, and HARRIS, Circuit Judges.

Reversed and remanded by published opinion. Chief Judge Gregory wrote the opinion, in which Judge Diaz and Judge Harris joined.

**ARGUED:** Megan Keenan, Joseph Charlet, UNIVERSITY OF VIRGINIA SCHOOL OF LAW, Charlottesville, Virginia, for Appellant. Kevin Bock Karpinski, KARPINSKI, COLARESI & KARP, P.A., Baltimore, Maryland, for Appellee. **ON BRIEF:** Stephen L. Braga, Appellant Litigation Clinic, UNIVERSITY OF VIRGINIA SCHOOL OF LAW, Charlottesville, Virginia, for Appellant. Sandra D. Lee, KARPINSKI, COLARESI & KARP, P.A., Baltimore, Maryland, for Appellee.

GREGORY, Chief Judge:

From day one of her employment at the City of Laurel, Felicia Strothers was singled out for harassment by her direct supervisor, Carreen Koubek. When Strothers complained to the director of her department, he revealed that Koubek had wanted to hire someone of a different race than Strothers, who is black. Strothers then submitted an informal memo detailing what she described as "harassment" and a "hostile environment." She soon told the City that she intended to file a formal grievance. The City fired Strothers the very next day, before Strothers could submit her grievance. Strothers then filed a retaliation claim under Title VII of the 1964 Civil Rights Act. The district court dismissed the claim on summary judgment under the burden-shifting framework for failure to establish a *prima facie* case of retaliation.

On appeal, we are asked to determine whether a reasonable jury could find that Strothers complained about conduct she reasonably believed to be a Title VII violation and that her complaint caused her firing. Viewing the facts in the light most favorable to Strothers, we conclude that Strothers engaged in protected activity under Title VII when she complained about what she reasonably believed to be a hostile environment and that her engagement in protected activity caused the City to fire her. Accordingly, Strothers has established a *prima facie* case of retaliation, and the district court's grant of summary judgment was improper. We therefore reverse the district court's decision and remand for further proceedings.

# I.

## A.

In August 2013, the City of Laurel interviewed Felicia Strothers, a black woman, for an administrative assistant position in the City's Department of Communications. She was interviewed by four representatives from the City, including Peter Piringer, the Communications Director, and Carreen Koubek, the Community Services Officer. Director Piringer would later reveal to Strothers that Koubek did not want to hire Strothers and that Koubek "wanted someone of a different race." J.A. 91. Despite Koubek's opposition, Piringer and others thought Strothers, who had over 20 years of experience, was the strongest and "most qualified" applicant and hired her anyway. J.A. 245. This case centers on Koubek's alleged harassment of Strothers starting from her first day on the job.

### 1.

When Piringer offered Strothers the job and before she accepted, Strothers informed him that she could not report to work until 9:05 a.m. each morning because of her children's bus schedule. Because the workday normally began at 9:00 a.m., Strothers offered to make up the five-minute difference by shortening her lunch break. Piringer accepted the proposed arrangement, and Strothers began as a six-month probationary employee, with her retention thereafter subject to evaluation. J.A. 72–73, 180.

Strothers' troubles began on day one and indeed, ten minutes before her start time. On her first day, October 7, Strothers reported to Koubek, her direct supervisor, at 9:05 a.m. Unbeknownst to Strothers, Koubek already marked her tardy. Although Koubek

knew that Piringer approved Strothers' modified work schedule, she decided that Strothers had to be in the office by 8:55 a.m. Indeed, Koubek effectively superseded the director's decision and had begun keeping a detailed log of Strothers' daily arrival time. J.A. 545–50. Koubek then told Strothers that she would have a few weeks during which she could arrive at 9:05 a.m. but would then have to find alternative arrangements for her children. J.A. 73, 545–46.

Despite purporting to give Strothers a few weeks to adjust her schedule, Koubek faulted Strothers for every arrival after 8:55 a.m., including on Strothers' first day. J.A. 545. According to the arrival log that Koubek maintained, Strothers arrived between 8:54 a.m. and 9:06 a.m. each day, with four occasions on which Strothers called ahead and arrived five to twenty minutes later than usual.[1] J.A. 545–50. Koubek submitted the arrival log to Strothers' personnel file and told human resources, Piringer, and other City officials about Strothers' perceived tardiness. J.A. 545, 555. Koubek's memo indicated that every entry, including arrivals before 9:00 a.m., exemplified problematic behavior. J.A. 545.

Koubek's notes also revealed that she tracked and faulted Strothers' every absence from her desk, including bathroom breaks. For instance, Koubek once noticed that Strothers had stepped away from her desk at 11:15 a.m. on a Wednesday and began to search for Strothers throughout the office before finding her in the bathroom. J.A. 670 ("Went out looking and she was in the bathroom. Reminded her to please let me know

---

[1] Although the log contained what appears to be precise arrival times down to the minute, Koubek's counsel admitted at oral argument that Koubek may have backfilled a portion of the arrival log. Oral Arg. 23:00–23:30.

4

when she steps away from the desk."). Koubek then reportedly told Strothers, "Didn't I tell you to tell me when you leave your desk?" J.A. 575. Koubek's notes confirm that Strothers would call, as instructed, before using the bathroom and that Koubek would record these breaks. J.A. 671–75. Even when Strothers received permission to use the restroom, Koubek faulted Strothers for not reporting when she was done. J.A. 669. Similarly, Koubek also tracked and timed Strothers' lunch breaks, as well as errands and other appointments.

Inexplicably, Koubek also faulted Strothers for lack of teamwork because Strothers did not ask her if she would like to have a massage appointment. Strothers had apparently cancelled her own appointment and made one for Director Piringer instead. Taking offense, Koubek wrote, "Nothing was said to me if I wanted to be included. Seems petty, but speaks volumes to lack of team work[.]" J.A. 668. Based on the record, there is no indication that the appointment was intended to be a group or work-related event.

Finally, Koubek confronted Strothers regarding Strothers' dress on casual Fridays at the office. On casual Fridays, City employees could wear "business casual," which meant "no capris, no leggings, [and] no sweats," though jeans were permitted. J.A. 288. On one such casual Friday, Strothers wore a pair of black pants that she asserted were jeans but that Koubek insisted were leggings.[2] According to Strothers, Koubek grabbed and tugged Strothers' pants without asking permission to do so. J.A. 103–04. Koubek also allegedly circled Strothers, lunged at her, and loudly berated her in front of the entire office

_____

[2] The pants were labeled "Nine West Jeans." J.A. 14. Koubek later described the pants as "jeggings"—a jean-legging mix that is formfitting. J.A. 521–22.

5

for wearing those pants. J.A. 574. Though Strothers maintained that she had worn the same pants on past casual Fridays without incident, she offered to change her pants. Koubek then required that Strothers deduct from her personal leave time the amount of time it took for her to go home and change. J.A. 575. Koubek also reported the dress code incident to other City officials. The head of human resources for the City noted that he had never received a dress code complaint about anyone else. J.A. 288–89.

Koubek then cited lateness and dress-code violations when giving Strothers a negative three-month performance evaluation. J.A. 561. However, at her deposition, Koubek conceded that Strothers did everything she was asked to do. J.A. 513–14. Indeed, Piringer, despite letting Strothers go, wrote a laudatory recommendation letter for her. He wrote, "[A]s the very first Administrative Assistant in this position, her background, life experiences and ability served her well and she was an asset to our organization during her short tenure with the office. She made friends quickly, has great interpersonal skills, is well-organized and can work independently. . . . She would be an asset to any employer." J.A. 12. The director also refused to endorse Koubek's negative evaluation of Strothers.

Strothers had several meetings and exchanges with Director Piringer and other City officials about Koubek's behavior. During one of these interactions, Piringer disclosed that Koubek had wanted to hire "someone of a different race," even though Piringer and the head of human resources thought Strothers was the strongest candidate. J.A. 91, 245, 354. Strothers also raised her concerns with City Council Member Frederick Smalls, who is black. J.A. 110–13. She told Smalls that Koubek was being hostile towards her because

6

of her race. Smalls reportedly indicated that he was going to speak with the Mayor because he did not want a discrimination suit to come out of the dispute.

During Strothers' employment with the City, she was the only black employee that Koubek supervised. J.A. 445–47, 455, 504–05. However, in 2015, Koubek did supervise another black employee, Joan Anderson. Koubek admitted that Strothers and Anderson, her only two black subordinates, were the only two employees that she had ever disciplined or reported to her superiors. J.A. 121, 530–31. Joan Anderson also told Strothers her belief that Koubek did not like black people and recommended that Strothers speak with Council Member Smalls about the harassment. J.A. 110. Oliver Willford, a former part-time employee who is also black, similarly told Strothers that Koubek would treat him and his wife, who volunteered for the City, "like scum," and that they had previously complained to the City. J.A. 118–19.

2.

On February 26, 2014, Strothers sent an internal memorandum to Piringer complaining about Koubek's actions. J.A. 574–76. The memo cited the dress code dispute as well as what Strothers perceived to be nonstop harassment from her first day, including Koubek's enforcement of the desk and bathroom policy. Strothers also objected to Koubek's submission of negative evaluations to her personnel file without her knowledge. Strothers characterized Koubek's actions as "harassment" and claimed that Koubek created a "hostile environment," one that she has never been subjected to in twenty years of office experience. J.A. 575–76. She indicated that Koubek's actions had made going to work

7

"difficult" and "unbearable."  J.A. 575.  This memo did not cite Piringer's comment about Koubek's preference for a white candidate during hiring.

After Strothers submitted the memo, she and Piringer negotiated over whether he would investigate whether she was being unfairly targeted.  J.A. 578–79.  Strothers also indicated that Koubek was "trying to railroad" her.  J.A. 567.  The record does not show that any investigative steps were in fact taken.  Strothers then sent Piringer an email expressing her intent to file a formal grievance against Koubek and requested the relevant forms.  J.A. 580 ("Please have the grievance forms for me to complete upon coming in tomorrow morning.").

The City fired Strothers the next day.  J.A. 637.  Koubek sent the termination notice to Strothers, though the notice was formally drafted by Piringer.  The stated reason for termination was tardiness.

B.

After her termination, Strothers filed two Title VII complaints.  Her first complaint with the Equal Employment Opportunity Commission was dismissed.  She then filed suit in Prince George's County Circuit Court, alleging both race discrimination and retaliation claims.  *See Strothers v. City of Laurel, Maryland*, 232 F. Supp. 3d 763, 767 (D. Md. 2017).  The City removed the case to the U.S. District Court for the District of Maryland.  *Id.*  The district court dismissed Strothers' discrimination claim but allowed her retaliation claim to proceed.  *Id.*  The City then filed a motion for summary judgment on the retaliation claim, which the district court granted and is now the subject of this appeal.

8

Applying the well-known, three-step burden-shifting framework, the district court concluded that Strothers failed at the first step—that is to show a *prima facie* case of retaliation. *Id.* at 771. According to the district court, Strothers failed to show that her internal complaints to the City constituted protected activity under Title VII because she could not reasonably believe that the harassment she experienced was attributable to racial animus. The district court also concluded that Strothers could not show that her firing was caused by her engagement in protected activity, because the City was not aware that Strothers was complaining about a possible Title VII violation. *Id.*

## II.

"We review de novo a district court's award of summary judgment, viewing the facts in the light most favorable to the nonmoving party." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 276 (4th Cir. 2015) (en banc). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute arises when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*; *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001).

III.

Title VII forbids (i) employment practices that discriminate against an employee on the basis of race, color, religion, sex, or national origin, 42 U.S.C. § 2000e-2, and (ii) retaliation against an employee for opposing adverse actions that she reasonably suspects to be unlawful under Title VII, 42 U.S.C. § 2000e-3; *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62–64 (2006); *Boyer-Liberto*, 786 F.3d at 276–77, 281. We refer to the former as the anti-discrimination provision and the latter as the anti-retaliation provision.

The scope of Title VII's anti-retaliation provision, § 2000e-3, is broader than the anti-discrimination provision in at least two respects. First, as the Supreme Court has held, "the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm" because "[a]n employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm *outside* the workplace." *Burlington*, 548 U.S. at 63, 67. Accordingly, retaliatory actions need not "affect the terms and conditions of employment" to come within Title VII's prohibition. *Id.* at 64. However, retaliatory actions do have to be "materially adverse"— such that they "might have dissuaded a reasonable worker" from engaging in protected activity. *Id.* at 68; *see also Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 174 (2011) (reaffirming same). Second, and more importantly for this case, this Court, *en banc*, has held that the anti-retaliation provision protects employees even when they complain of actions that are not actually unlawful under Title VII. *Boyer-Liberto*, 786 F.3d at 282. Instead, complaining employees are protected if, at the time of their complaint, they "have

10

an objectively reasonable belief in light of all the circumstances that a Title VII violation has happened or is in progress." *Id.* (citation omitted). Because "Title VII depends for its enforcement upon the cooperation of employees who are willing to file complaints and act as witnesses," *Burlington*, 548 U.S. at 67, the greater breadth of the anti-retaliation provision ensures that employees feel free to come forward with their grievances, even when a violation is not yet conclusive based on what one witness might know. *See Boyer-Liberto*, 786 F.3d at 283.

A plaintiff may prove that an employer took action with discriminatory or retaliatory intent through direct evidence or through the burden-shifting framework of *McDonnell Douglas Corp. v. Green. Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under the burden-shifting framework, the plaintiff must first establish a *prima facie* case of retaliation by showing: "(1) she engaged in a protected activity; (2) the employer acted adversely against her; and (3) there was a causal connection between the protected activity and the asserted adverse action."[3] *See Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008) (citing

---

[3] We note that some cases in this Circuit have continued to recite the standard of a retaliation claim as requiring an "adverse employment action" or activity rather than simply an "adverse action." *See, e.g.*, *Foster*, 787 F.3d at 250; *Boyer-Liberto*, 786 F.3d at 281. In those cases, the "adverse employment action" standard does not appear to have been necessary to the outcome, and as another panel of this Court has recognized, that formulation was expressly rejected by the Supreme Court in *Burlington Northern. Lettieri v. Equant Inc.*, 478 F.3d 640, 650 n.2 (4th Cir. 2007). For purposes of clarity, we adopt the "adverse action" formulation because the adverse action need not be employment- or workplace-related in order to sustain a retaliation claim. *See Burlington*, 548 U.S. at 67 ("The scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm.").

11

*Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007)).  After the *prima facie* showing is made, "[t]he burden then shifts to the [employer] to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason." *Foster*, 787 F.3d at 250.  "If the employer makes this showing, the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons were not its true reasons, but were a pretext for discrimination."  *Id.* (internal quotation marks and citation omitted).

On appeal, we are concerned only with Strothers' ability to make a *prima facie* showing of retaliation under the burden-shifting framework, as that was the sole basis for the district court's decision to grant summary judgment.  Further, because it is patently obvious and undisputed that termination is a materially adverse action, we discuss only the first and third elements of the *prima facie* case—protected activity and causation.

A.

We first consider whether Strothers engaged in protected activity under Title VII.  Such activity includes "complaining to superiors about suspected violations of Title VII."[4]  *Boyer-Liberto*, 786 F.3d at 281 (citation and alterations omitted).  To warrant protection, the employee's perception of a violation must be "objectively reasonable" under the circumstances known to her.  *Id.* at 282.  Here, Strothers argues that her complaint of a

---

[4] Protected opposition activity can take numerous forms and need not be part of a formal proceeding.  Possibilities include "utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities."  *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998).  Here, Strothers' internal memorandum and emails come within that expansive definition.

12

hostile environment was protected activity. Thus, our inquiry is whether the circumstances known to Strothers at the time of her complaint support a reasonable belief that a hostile work environment existed or was in progress. *See id.*

To determine whether Strothers had a reasonable basis to oppose what she perceived as a hostile environment, we examine the elements of a hostile environment claim in light of what she knew. Ordinarily, to prove a hostile work environment claim under Title VII, a plaintiff must show "(1) unwelcome conduct; (2) that is based on the plaintiff's [protected status]; (3) which is sufficiently severe or pervasive to alter her conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Okoli v. City Of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011). Here, because Strothers is bringing a retaliation claim, she must show that her belief that these elements were satisfied was reasonable. Viewing the facts in the light most favorable to Strothers, the non-moving party, a reasonable jury could find that Strothers had reason to believe that she was being subjected to a hostile environment.

1.

The first element of a hostile environment claim, unwelcome conduct, is not a high hurdle. As this Court has repeatedly held, an employee can demonstrate that certain conduct is unwelcome simply by voicing her objection to the alleged harasser or to the employer. *E.g.*, *E.E.O.C. v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009); *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 314 (4th Cir. 2008); *Smith v. First Union Nat. Bank*, 202 F.3d 234, 242 (4th Cir. 2000). The alleged conduct need not be severe, as severity is better addressed under the third element, pervasiveness. However, the nature of

13

the conduct may indicate whether or not the conduct is unwelcome. *See Sunbelt Rentals, Inc.*, 521 F.3d at 314 ("[I]t is difficult to see how any employee would welcome derisive behavior directed at his faith.").

The record shows that Strothers was subjected to numerous types of conduct that could not have been welcomed. When Koubek accused Strothers of violating the dress code, Koubek circled Strothers, lunged at her, and grabbed her pants without seeking permission. Further, Koubek tracked Strothers' every movement in the office, requiring Strothers to obtain permission even to relieve herself in the restroom. Evidence also shows that Koubek considered Strothers late even on days when she arrived before the office's 9:00 a.m. opening. Among other things, Strothers was faulted for not booking Koubek a massage appointment, even though there was no discernible reason why Koubek should have been included. Koubek then compiled these incidents into negative evaluations and placed them in Strothers' personnel folder, knowing that she was a probationary employee. It is hard to imagine a reasonable worker who would not find unwelcome Koubek's constant surveillance, badgering, and criticism. *See E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 407 (4th Cir. 2005) (holding that employee's objection to heightened scrutiny of another employee was protected activity).

And indeed, Strothers repeatedly informed Director Piringer, Koubek, and others of her objections. Even Koubek's own notes record several instances in which Strothers verbally objected directly to Koubek herself and to Piringer. J.A. 546, 549, 550. Strothers also put her objections in writing and went as far as to complain to a member of the City Council.

14

We therefore conclude that, at the summary judgment stage, Strothers has adequately demonstrated her reasonable belief that she was subjected to unwelcome conduct.

2.

The second element of a hostile environment claim requires that the offending conduct be based on the employee's "race, color, religion, sex, or national origin." 42 U.S.C.A. § 2000e-2; *see Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003) (en banc). In other words, "Title VII does not prohibit all verbal or physical harassment in the workplace"—it is directed only at actions that occur "because of" one of the protected statuses. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). In determining whether offensive conduct can be attributed to discrimination against the employee's race or other protected status, courts must view the behavior in light of the social context surrounding the actions. *See id*. Here, Strothers had ample reason to believe that she was being mistreated "because of" her race.

Indeed, Piringer, the director of her department and Koubek's supervisor, told her as much. Against the backdrop of Strothers' complaint against Koubek, Piringer disclosed that Koubek wanted to hire someone of a different race than Strothers. Race—not experience, qualifications, or skills—was the differentiating factor that Piringer chose to highlight. That Piringer would volunteer such information supports a reasonable inference that he thought Strothers' race explained why Koubek was harassing her. In other words, Strothers' employer injected Strothers' race into the equation and gave her reason to think that her race was relevant to the harassment she was experiencing.

15

Even setting aside Piringer's observations about Koubek, Strothers also heard from former City employees who explicitly warned her about Koubek's history of harassing black employees. Two former black employees told Strothers that Koubek did not like black people and that she singled them out for differential treatment. Indeed, both recounted similar stories of how Koubek harassed and micromanaged black employees and volunteers, even getting into a shoving match with one of them.

Against that history, Strothers was also aware that she was the only black subordinate employee and that she was the only one whom Koubek chose to surveil and scrutinize. *See Ocheltree*, 335 F.3d at 332 (inferring discrimination in part because no male employee was subjected to same conduct as female plaintiff). Moreover, her being selected for such scrutiny apparently had nothing to do with her job performance, as Koubek herself acknowledged that Strothers did everything as instructed. Director Piringer even lauded Strothers as an exemplary employee in his reference letter. These considerations together support a reasonable inference that Strothers was being subjected to unlawful discrimination.

The district court arrived at the opposite conclusion after failing to draw all reasonable inferences in favor of Strothers, the non-moving party. Rather than drawing any explanatory power from Piringer's revelation about Koubek, the district court adopted the most charitable interpretation possible in favor of the City, the *moving* party. Specifically, the district court credited Koubek's testimony that she preferred the white candidate because of the white candidate's prior experience working for the City. *Strothers*, 232 F. Supp. 3d at 769. The district court then concluded that Koubek preferred

16

the white candidate for legitimate reasons; it was only coincidental that the preferred candidate happened to be white and the employee who was subjected to unwelcome conduct happened to be black. *Id.* However, Piringer's comment about Koubek's hiring preference creates at least some ambiguity as to her true motivations, and the jury is not required to believe Koubek's rationalization. Instead, a reasonable jury could well conclude that Koubek's reason for preferring the white candidate was pretextual. Not only did Piringer, who had experience working with Koubek, seem to suspect Koubek of acting with possible racial bias, but Koubek's purported rationale for preferring the white candidate demonstrably carried little weight with the rest of the City officials, who concluded that Strothers was the most qualified candidate.

Taken together, Strothers knew three things that suggested she was the target of racial discrimination, rather than a mere "workplace squabble." *See Okoli*, 648 F.3d at 224. First, former employees revealed a history and pattern of racial discrimination. Second, she was singled out for disparate treatment from the moment she arrived on the job for reasons unrelated to her job performance. Third, the director of her department cited Strothers' race when she complained about the disparate treatment and harassment. And contrary to what the City appears to argue, harassment need not be accompanied by a contemporaneous statement of animus to be actionable under Title VII—rather, the connection between animus and conduct may be inferred from the totality of the circumstances. *See Oncale*, 523 U.S. at 82 (instructing courts in harassment cases to apply "[c]ommon sense" and "appropriate sensitivity to social context" to "constellation of surrounding circumstances, expectations, and relationships which are not fully captured by

17

a simple recitation of the words used or the physical acts performed"). Because we are required to draw all reasonable inferences in favor of Strothers at this stage, we must conclude that she has demonstrated a genuine dispute of material fact as to her reasonable belief that racial discrimination motivated Koubek's actions.

3.

The third element of a hostile environment claim requires that the offending conduct be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Ocheltree*, 335 F.3d at 333 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)) (alterations omitted). This element has both a subjective and objective component, i.e., the employee must both personally and reasonably believe that the conduct rises to the level of a hostile environment. *Id.* (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993)). In assessing whether harassment is objectively abusive, courts must examine the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. In this case, the City contests only the objective reasonableness of Strothers' belief that Koubek's behavior was actionable under Title VII.[5] As detailed below, we conclude that there are sufficient facts

---

[5] We note that it is clear that Strothers subjectively perceived Koubek's harassment as pervasive, given her numerous complaints and her characterization of such behavior as creating a hostile environment. She indicated that the situation made work "unbearable, making it difficult to come into the office," and that either she or Koubek needed to be reassigned. J.A. 575.

18

for a reasonable jury to find that Strothers reasonably believed that Koubek's actions were sufficiently severe or pervasive as to alter the terms or conditions of Strothers' employment and create an abusive environment.

As relevant here, Title VII prohibits discrimination as to "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2. "The phrase 'terms, conditions or privileges of employment' in Title VII is an expansive concept." *Meritor*, 477 U.S. at 66 (alterations and citation omitted). However, to determine whether Koubek's conduct was sufficiently severe or pervasive as to alter conditions of Strothers' employment, we need not test the definition's outer limits.

The record clearly shows that Koubek significantly altered terms and conditions of Strothers' employment. First, Koubek changed Strothers' daily arrival time. Although Strothers accepted Piringer's job offer with the understanding that her arrival time would be 9:05 a.m., Koubek effectively overruled that arrangement and began requiring Strothers to arrive by 8:55 a.m.—five minutes before the office opened. While a difference of ten minutes may not always constitute a significant change in employment conditions, that difference here was expressly bargained for by the employee and had a significant effect on the employee's decision to accept the job because it affected her capacity to be a responsible mother. Second, viewing the disputed facts in the light most favorable to Strothers, Koubek also changed the dress code as applied to Strothers. Although the dress code allowed jeans on Fridays, Koubek took issue with Strothers' "Nine West jeans," publicly humiliated her, and forced her to take time off to change—not to mention Koubek's possible act of battery. Third, Koubek instituted a policy that forbid Strothers

19

from leaving her desk, including to use the restroom, without specific approval—a policy of which Strothers was unaware before accepting the job. And not only did Strothers have to receive Koubek's permission for every use of the bathroom, she had to report the length of each trip. Thus, a reasonable jury could find that the alleged harassment was a daily occurrence that pervaded numerous aspects of Strothers' employment.

The net effect of Koubek's actions was an abusive environment likely to "detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." *See Harris*, 510 U.S. at 23 (concluding that such "tangible" effects are sufficient but not necessary to prove violation of Title VII). For instance, a reasonable jury could well find that Koubek's actions were likely to affect the advancement of Strothers' career, including any promotion from a probationary position to a permanent one. In addition to harassing Strothers, Koubek submitted a negative evaluation, compiled from her list of perceived infractions and slights, to Strothers' file, knowing that she was a probationary employee whose continued employment was contingent on her performance.

A reasonable jury could also find that Koubek's actions objectively interfered with Strothers' ability to do her job. Heightened scrutiny, unfair evaluations, and arbitrary dress codes are likely to make a job more difficult and trigger responses from workers who feel compelled to protest their treatment, which may further interfere with their work. Here, due to Koubek's actions, Strothers had to take time off of work in order to conform her dress to Koubek's standards. She also had to write detailed memoranda to defend herself against accusations of misconduct. Furthermore, it is difficult to imagine that having to

20

report every incident as minor and as personal as using the restroom would not interfere with productivity. Such reporting is not only time-consuming but requires the disclosure of highly intrusive and potentially embarrassing details of one's bodily functions. In light of these facts, a reasonable jury could easily conclude that the totality of Koubek's actions would discourage a reasonable employee from working for the City and that Strothers reasonably believed that Koubek's actions were so frequent and severe as to be abusive.

We therefore conclude that Strothers has demonstrated a genuine dispute of material fact as to her reasonable belief that Koubek created an abusive environment that altered the "terms, conditions or privileges" of her employment with the City.

4.

The final element of a hostile environment claim requires that the offensive conduct be imputable to the employer. *Boyer-Liberto*, 786 F.3d at 278. If the harasser is a co-worker, then the employee must show that the employer was "negligent in controlling working conditions"—that is, the employer "knew or should have known about the harassment and failed to take effective action to stop it." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013); *Ocheltree*, 335 F.3d at 333–34. If the harasser is a supervisor, then the employer may be either strictly or vicariously liable for the supervisor's actions.[6] *See Vance*, 570 U.S. at 431. In this case, the parties dispute whether Strothers reasonably believed that Koubek was a "supervisor," and if not, whether the City was negligent in responding to the alleged harassment. In our view, a reasonable jury could find that

---

[6] Whether the employer is strictly liable depends on whether the supervisor's harassment culminates in a "tangible employment action." *Vance*, 570 U.S. at 429–30.

21

Strothers reasonably believed that Koubek was her supervisor and, alternatively, that she reasonably believed that the City was negligent in failing to address the ongoing harassment.

In *Vance*, the Supreme Court resolved a circuit split and defined "supervisor" for purposes of imputed liability under Title VII. 570 U.S. at 430–31. Specifically, it held that a supervisor is an individual who has been empowered "to take tangible employment actions against the victim, i.e., to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" In doing so, the Court rejected "the more open-ended approach . . . which ties supervisor status to the ability to exercise significant direction over another's daily work." *Id.* at 431.

However, because Strothers is seeking to prove retaliation, rather than an actual hostile environment claim, she need only show that it was reasonable for her to believe that Koubek was her supervisor, not that Koubek actually met all aspects of the standard set forth in *Vance*. *See Boyer-Liberto*, 786 F.3d at 282. As the Supreme Court held in *Burlington*, which *Vance* reaffirmed, the scope of the retaliation provision is broader than the scope of the anti-discrimination provision. *See Vance*, 570 U.S. at 439 (applying the framework set out in *Burlington*); *see also Burlington*, 548 U.S. at 63, 67.

*Vance*'s application of its definition of supervisory status and "tangible employment actions" to previous Supreme Court cases is instructive. In an earlier case, *Faragher v. City of Boca Raton*, the Supreme Court had determined that an employer was vicariously liable for a supervisor's harassment of female lifeguards. 524 U.S. 775, 780–81, 808.

22

*Vance* described the harasser in *Faragher* as a "clear" example of a supervisor because he "could hire new lifeguards, supervise their work assignments, counsel, and discipline them." 570 U.S. at 437 (citing *Faragher*, 524 U.S., at 781).

Because Koubek's role bears significant similarities to that of the lifeguard supervisor discussed in *Vance*, the record is sufficient for a reasonable jury to conclude that Strothers at least had reason to believe that Koubek could take "tangible employment action" against her.

First, Koubek was part of the hiring and interview process and indeed opposed hiring Strothers. Though her input was not accepted, Koubek nevertheless had the authority to provide such input. *See Vance*, 570 U.S. at 437 & n.8 (noting that individual qualified as supervisor even though his "hiring decisions were subject to approval by higher management"). And the fact that Koubek had such authority was made clear to Strothers by Piringer, the head of the department, who disclosed Koubek's involvement in the hiring process.

Second, Koubek's actions suggested that she had the power to discipline Strothers. For instance, Koubek claimed that she had authority from the head of human resources to document and monitor Strothers' arrivals and absences. J.A. 493. That authority, along with Koubek's repeated efforts at reprimanding Strothers, could support a reasonable belief that Koubek had the power to punish Strothers for non-compliance. *See id.* (citing counseling and discipline as indicative of supervisory position). Indeed, Koubek told Strothers repeatedly that arrivals after 8:55 a.m. "can't happen" and that Strothers had to make alternative arrangements if she wanted to continue working for the City. These

23

actions suggested to Strothers that Koubek could influence her termination, the ultimate form of workplace discipline. J.A. 545–50.

Third, Koubek's conduct also indicated that she controlled Strothers' work schedule, job responsibilities, and work assignments. Director Piringer, who wielded ultimate hiring and firing authority, is clearly one of Strothers' supervisors, and he determined that Strothers could start at 9:05 a.m. Koubek, on her own initiative, opposed that arrangement and succeeded in changing Strothers' start time to 8:55 a.m. Koubek also determined the scope of Strothers' job duties, deciding that part of Strothers' job was to remain at her desk at all times in order to serve as a receptionist—even though the building already had a receptionist and Strothers was hired to be an administrative assistant. Koubek also had the authority to assign Strothers projects, including the creation of a City brochure and updating of the City website, which Koubek then reviewed. J.A. 463, 467, 469–70.

Fourth, Koubek asserted control over Strothers' use of her employment benefits. For instance, she controlled Strothers' use of the City's personal leave policy. When Koubek demanded that Strothers change her pants, she also required that Strothers deduct the time required to go home and change from her personal leave time. On other occasions, Koubek approved Strothers' use of personal leave and her lunch hour. J.A. 547.

And finally, Koubek formally submitted a negative, three-month performance review to human resources and attempted to influence Strothers' retention by the City. The evaluation was especially significant for Strothers, a probationary employee, as her continued employment depended on her performance. *See Vance*, 570 U.S. at 437 n.8 (noting that individual would have supervisory status if he "had input on evaluations" that

24

carried economic consequences). In light of the full constellation of Koubek's actions, a reasonable jury could find that Strothers reasonably believed that Koubek could take tangible employment actions against Strothers and that Koubek was a "supervisor" for purposes of Title VII.

Alternatively, even if we were to conclude that Koubek could not reasonably be considered a "supervisor" under *Vance*, Koubek's conduct would still be imputable to the City because the City knew or should have known of the harassment and failed "to take prompt remedial action reasonably calculated to end the harassment." *See Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 423 (4th Cir. 2014) (citing *Amirmokri v. Balt. Gas & Elec. Co.*, 60 F.3d 1126, 1131 (4th Cir. 1995)). It cannot be seriously disputed that Strothers diligently kept the City informed of every aspect of Koubek's harassment, through numerous phone calls, emails, meetings, and detailed memoranda, throughout the duration of her employment. Indeed, within the first month, Koubek herself referred to the situation as a "Mother/Father dynamic" because Strothers would complain to Piringer whenever she disagreed with Koubek's actions. J.A. 546. Moreover, Piringer and the City had reason to suspect that Koubek was motivated by racial bias. Not only did Piringer specifically note that Koubek wanted to hire someone of a different race, but the City had received other complaints from black employees about Koubek and was on notice of a possible pattern of race-based harassment. J.A. 118. Thus, there are sufficient facts to show that Strothers reasonably believed that the City had actual, or at minimum constructive, knowledge of the harassment and its racial dimension. *See Freeman*, 750 F.3d at 423.

25

Despite Strothers' memo and other efforts reporting the harassment, the City neither reassigned Strothers, as she requested, nor took lesser steps to investigate or prevent the alleged harassment. For instance, the City accepted Koubek's modification of Strothers' start time. It also allowed Koubek to force Strothers to report the timing and duration of every bathroom visit. The City then failed to even investigate whether Koubek physically assaulted Strothers by grabbing her pants. *See Amirmokri*, 60 F.3d at 1131 (holding that failure to investigate and discipline harasser was indicative of inadequate employer response). Shortly before she was fired, Strothers requested an investigation into whether the dress code was being applied discriminatorily but no investigative steps were apparently taken before the termination. Although the City had a nondiscrimination and grievance policy, it initially told Strothers that probationary employees could not file such grievances. J.A. 580. And, when Strothers indicated that she wanted to file a formal grievance, she was fired the next day. In other words, the facts support a reasonable conclusion that the City, by failing to take any notable remedial actions after repeatedly being informed of ongoing harassment, was in part responsible for the hostile environment that Strothers experienced.

In sum, a reasonable jury could find that Strothers had reason to think that Koubek's actions were imputable to the City, either because Koubek was a supervisor or because the City was negligent in preventing the harassment.

*     *     *

We therefore conclude that Strothers has demonstrated, at the summary judgment stage, sufficient facts to support a reasonable belief that she was subjected to a hostile

26

environment. Accordingly, the district court erred when it determined that Strothers' complaints did not constitute protected activity and that she had not satisfied the first element of *prima facie* retaliation.

B.

We next address the third element of the *prima facie* case, causation. Here, we ask whether Strothers adequately demonstrated that her engagement in protected activity caused her firing. As this Court has held, establishing a "causal relationship" at the *prima facie* stage is not an onerous burden. *See Foster*, 787 F.3d at 251; *Burgess v. Bowen*, 466 F. App'x 272, 282 (4th Cir. 2012) ("[V]ery little evidence of a causal connection is required to establish a prima facie case of retaliation." (citation omitted)). Purported victims of retaliation do not have to show at the *prima facie* stage that their protected activities were but-for causes of the adverse action. *Foster*, 787 F.3d at 251 (holding that plaintiff need not establish but-for causation until pretext stage of burden-shifting framework). An employee may establish *prima facie* causation simply by showing that (1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity. *See Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994); *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989); *Burgess*, 466 F. App'x at 282. For the reasons below, we conclude that a reasonable jury could find that the City knew or should have known that Strothers was complaining about a Title VII violation and that her complaints caused her termination.

27

1.

As this Court has held, no causal connection can exist between an employee's protected activity and an employer's adverse action if the employer was unaware of the activity. *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998). An employer is aware of an employee's protected activity when he learns of an employee action that he understood or should have understood to be opposition against a Title VII violation. *See Burgess*, 466 F. App'x at 282. When determining whether the employer should have understood the nature of the employee's action, courts examine not just the employee's complaint but also the factual context that is known to the employer. *Okoli*, 648 F.3d at 224.

The City primarily argues that it had no reason to think that Strothers was engaged in protected activity because her informal memorandum did not explicitly cite *racial* discrimination. However, this Court rejected a similar argument in *Okoli*, where the employer argued that it was not on notice because a female employee only alleged "harassment" but not "sexual harassment" in her complaining email. *See id.* This Court held that "[t]he City surely should have known that [the employee's] complaints of 'harassment' likely encompassed sexual harassment," in part because the plaintiff described "unethical," "degrading and dehumanizing" conduct and the term "harassment" is generally understood as a "term of art." *Id.* at 224 & n.9. In this case, Strothers' informal memo, submitted on February 26, 2014, complained of both "harassment" and a "hostile environment," both of which can be considered terms of art. Just as the terms should be understood, in certain contexts, to encompass sexual harassment, they should also be

28

understood, in certain contexts, to encompass possible discrimination on the basis of other recognized protected statuses.

The City should have known that the alleged harassment and hostile environment pertained to racial discrimination given what it knew about Koubek and her relationship with Strothers. Quite simply, Director Piringer was the one who pointed out that Koubek wanted to hire someone of a "different race" when Strothers complained about how Koubek was treating her. In doing so, Piringer suggested that Strothers' race was relevant to the harassment. This obviated the need for Strothers to regurgitate back to Piringer what he already knew. *See id.* at 224 (concluding that supervisor also "surely would have known" nature of employee complaint because he was alleged harasser).

For these reasons, we conclude that Strothers has demonstrated a genuine dispute of material fact as to the City's awareness of her engaging in protected activity.

2.

The only remaining question is whether the City took adverse action against Strothers soon after learning of her complaint, as temporal proximity is sufficient to establish a causal connection at the *prima facie* stage. *See Carter*, 33 F.3d at 460. In this case, Strothers submitted her informal memo on February 26 and sent an email on March 6, asking for grievance forms and saying that she intended to file a formal grievance on March 7. J.A. 580. The City fired Strothers on March 7, the very next day. Because the lapse of one or even nine days is well-within what this Court has found to be a causally significant window of time, we conclude that Strothers has met her burden of showing causation at the *prima facie* stage. *Carter*, 33 F.3d at 460 ("This court found a causal

29

connection between a plaintiff's protected activity and her discharge where the employer, with knowledge of a pending discrimination complaint, fired plaintiff approximately four months after the complaint was filed." (citing *Williams*, 871 F.2d at 457)).

\* \* \*

We therefore conclude that Strothers has shown, at the summary judgment stage, sufficient facts to support a causal connection between her complaints about Koubek's harassment and her termination by the City. Accordingly, the district court erred when it determined that Strothers failed to establish the third element of *prima facie* retaliation.

IV.

For the aforementioned reasons, we hold that the district court erred when it concluded that Strothers failed to demonstrate a *prima facie* case of retaliation under the burden-shifting framework. We therefore reverse the district court's grant of summary judgment and remand for further proceedings consistent with this opinion.

*REVERSED AND REMANDED*