**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 24-1636**

---

EDWARD M. WILLIAMS,

       Plaintiff – Appellant,

v.

FAIRFAX COUNTY GOVERNMENT,

       Defendant – Appellee,

and

FAIRFAX COUNTY DEPARTMENT OF FAMILY SERVICES,

       Defendant.

---

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Michael Stefan Nachmanoff, District Judge. (1:23-cv-01004-MSN-IDD)

---

Argued:  May 7, 2025                    Decided:  July 16, 2025

---

Before NIEMEYER and BENJAMIN, Circuit Judges and KEENAN, Senior Circuit Judge.

---

Affirmed by unpublished per curiam opinion.

---

**ARGUED**: Roya Vasseghi, VASSEGHI LAW GROUP, Fairfax, Virginia, for Appellant. Jamie Marie Greenzweig, FAIRFAX COUNTY ATTORNEY'S OFFICE, Fairfax, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Edward Williams was fired by his employer, Fairfax County, Virginia (the County). Williams later brought this action against the County alleging, among other things, retaliation and discrimination claims under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e through 2000e-17. He now appeals from the district court's award of summary judgment to the County. After reviewing the record, we conclude that Williams failed to meet his burden of persuasion to show that the County's reasons for firing him were pretextual. We therefore affirm the district court's award of summary judgment on both claims.

I.

In July 2019, the Fairfax County Department of Family Services (Family Services) hired Edward Williams, an openly homosexual male, as a Child Protective Services (child protection) supervisor. In that role, Williams supervised multiple social service specialists. In consultation with those social service specialists, Williams was responsible for identifying "crisis situations" and for "guid[ing] intervention as needed to address difficult or dangerous [child protection] situations." JA 339.

Williams was expected to hold weekly supervisory meetings with the social service specialists in his unit and to record notes after those meetings. Williams' supervisor explained that those notes should contain a summary of the specialists' findings and actions, and the guidance that Williams gave them regarding what further protective action should be taken.

3

Soon after joining Family Services, Williams expressed concern that he had not been trained adequately. As a result, he requested assistance in learning how to better perform his job duties.

In response to Williams' request, Family Services assigned Sonia Aronow, a former child protection supervisor, to "coach" Williams. Aronow and Williams met for a few hours each week to discuss his job duties. During those sessions, Aronow discussed applicable child welfare laws, the required job skills, Williams' strengths and weaknesses, and recommendations for Williams to improve his job performance. After Williams met with Aronow for about four months, Williams informed Family Services that he was ready to discontinue the coaching sessions. Williams' supervisor approved Williams' request, provided that he complete an additional one or two coaching sessions.

### A.

In mid-January 2020, Williams had his next-to-last coaching session with Aronow. He asked Aronow to review with him the mid-year evaluation that Family Services had given him. That evaluation showed that Williams' job performance was satisfactory but also listed some areas for improvement. Williams wanted Aronow to assist him in developing methods for improvement in the areas identified in his evaluation.

During Williams' conversation with Aronow about his mid-year evaluation, Aronow mentioned Williams' sexual orientation. Aronow told Williams that he should be "mindful of the environment" before discussing his husband. JA 678. Aronow stated that Williams "seem[ed] like the type of person who just wants to get [his homosexuality] out

4

there … and make people deal with it or not." JA 678; JA 1109. Williams agreed that he is "kind of that way." JA 678.

Nonetheless, Williams stated that he had a right to talk about his husband because it was legal for them to be married and "[t]he topic of marriage is a conversation starter." JA 678. Aronow responded that some people might be "bothered" by the fact Williams is married to a man. JA 678; JA 1109. She also told him that, if he chose to disclose that fact, he "must be willing to accept the consequences." When Williams asked Aronow what she meant by using the term "consequences," Aronow did not directly answer. Instead, she stated that some people prefer not to share information about their private lives, to which Williams responded, "that is [their] choice." JA 679.

The day after this conversation, Williams reported Aronow's comments to his supervisor. Williams recalled that his supervisor "was apologetic and appalled that Ms. Aronow treated [him that] way." JA 679. Williams' supervisor stated that she would cancel his final meeting with Aronow and offered Williams her help in obtaining further information about Fairfax County's Employee Assistance Program.

Williams also met with employees in the human resources department of Family Services (HR personnel), who said that they would investigate the matter. A short time later, employees from that department interviewed Aronow. Aronow did not deny making the above-described comments to Williams, but she also explained that those comments were made in the context of her advice that Williams set boundaries at work to deal with discussions about his personal life.

5

The HR personnel ultimately determined that there was insufficient evidence to substantiate that a discriminatory act had occurred. But the County informed Aronow that her comments were "inappropriate" and "didn't align with what Fairfax County represented." JA 1088. A few weeks later, Aronow's temporary position with the County ended. The County had intended to recommend that Aronow receive additional training in cultural diversity, but did not do so given Aronow's departure.

## B.

Almost four months after Williams' conversation with Aronow, Williams was fired from his position with the County. The County based its decision on its review of Williams' open and closed cases, including Williams' actions and later failure to act in a particular case.

This cited case (the drug addiction case) involved a father, who was experiencing a manic mental health episode, and a mother, who gave the father their infant to hold in an attempt to calm the father down. When asked, both parents admitted to using heroin and cocaine. After learning about this incident, certain child protection specialists that Williams supervised developed a safety plan. That plan dictated that the "father would not be alone with the infant;" the plan also called for the maternal grandparents "to supervise contact between the infant and the father." JA 1599. After approving the safety plan, Williams recommended that the case be closed.

One month later, the mother in the drug addiction case was driving under the influence of narcotics and "overdosed" while transporting her two children, including her infant. A different Family Services unit opened a new case file (the overdose case) and

6

discovered the drug addiction case handled by Williams' unit.  One of Williams' supervisors, who was assigned to work on the overdose case, expressed concern about Williams' earlier handling of the drug addiction case.  Williams' supervisor observed that "there were minimal notes and only one supervision note from Williams," and that the file did not contain any references to case history or to "ongoing consideration of the safety of the children or risk to the children."  JA 1600.  Williams' supervisor also "was unable to ascertain whether the safety plan had been monitored" or whether "anyone from [child protection services] had visited the family."  JA 1600.  In addition, Williams' supervisor met with the maternal grandparents and discovered that "[t]hey were extremely upset that they were included in the safety plan … because they did not want to be responsible for supervising visits between the children and the father."  JA 1600.

When asked by his supervisor, Williams could not recall much information about the drug addiction case.  Later, in his deposition, Williams stated that he did not believe that his supervisor was "fabricating" her concerns, but he thought that she was "nitpicking." JA 331.

Based on their concerns about Williams' handling of the drug addiction case, Williams' supervisors conducted a review of his open child protection cases.  That review revealed "deficiencies … related to … putting safety plans in place, monitoring the safety plans once they were in place, assessing child abuse and neglect cases, providing and documenting supervisory guidance, and completing required administrative tasks." JA 1601.

7

Williams' supervisors also asked a quality assurance manager for the County to conduct a review of Williams' closed cases to determine whether Williams' work exhibited "a consistent pattern or practice of failing to meet mandated requirements related to child welfare work" as a child protection supervisor. JA 755–56. To complete that task, the quality assurance manager considered the data reflected in Williams' case notes. She concluded that Williams had approved the closure of over 50% of his cases "without making a determination as to whether the involved children were safe." JA 1806–09. She further noted, among other issues, deficiencies with the safety plans crafted by Williams' unit. The quality assurance manager documented her findings in a report that she submitted to Williams' supervisors.

Williams' supervisors ultimately concluded that Williams had "failed to meet the minimum standards of performance" required for his job. Fairfax County terminated Williams from his position in May 2020.

### C.

A few months later, Williams filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission (EEOC). The EEOC investigated Williams' allegations and issued a "Right to Sue" letter.[1] Williams later sued Fairfax County, alleging that the County (1) discriminated against him based on his homosexuality;

---

[1] When the EEOC dismisses a charge of discrimination or takes no remedial action within a certain time limit, the aggrieved employee may file a civil action in district court. 42 U.S.C. § 2000e-5(f). In this situation, the EEOC issued to the employee a "Right to Sue" letter, which serves as "a prerequisite to the jurisdiction of the federal courts." *See Perdue v. Roy Stone Transfer Corp.*, 690 F.2d 1091, 1092–93 (4th Cir. 1982).

(2) created a hostile work environment;[2] and (3) retaliated against him after he reported Aronow's discriminatory comments, all in violation of Title VII.  After discovery was conducted in the case, the district court granted the County's motion for summary judgment.  Williams now appeals from the district court's judgment.

II.

"We review an award of summary judgment de novo."  *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019).  "Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id*. (internal quotation marks omitted) (quoting Fed. R. Civ. P. 56(a)).  In reviewing an award of summary judgment, we consider the facts in the light most favorable to the non-moving party, and we draw all reasonable inferences in the non-moving party's favor.  *Id.*

"Title VII forbids (i) employment practices that discriminate against an employee on the basis of race, color, religion, sex, or national origin ... and (ii) retaliation against an employee for opposing adverse actions that she [or he] reasonably suspects to be unlawful under Title VII."  *Strothers v. City of Laurel*, 895 F.3d 317, 326–27 (4th Cir. 2018) (citations omitted).  When, as Williams has done here, a plaintiff asserts discriminatory treatment under Title VII but does not allege direct evidence of discrimination, the plaintiff

---

[2] Because Williams' opening brief in this Court does not discuss his hostile work environment claim, that claim is not before us.  *See United States v. Al-Hamdi*, 356 F.3d 564, 571 n.8 (4th Cir. 2004) ("[C]ontentions not raised in the argument section of the opening brief are abandoned.").

may proceed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Haynes*, 922 F.3d at 223. This framework also applies to Williams' retaliation claim. *Id.*

Under the *McDonnell Douglas* burden-shifting framework, a plaintiff first must make out a prima facie case of retaliation or discrimination. *Hannah P. v. Coats*, 916 F.3d 327, 342 (4th Cir. 2019). After the plaintiff establishes a prima facie case of retaliation or discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory or nonretaliatory justification for its adverse employment action. *Haynes*, 922 F.3d at 223. If the employer satisfies this burden, then the plaintiff must prove by a preponderance of the evidence that the employer's purportedly neutral reasons were pretext for discrimination or retaliation for protected activity. *Id*. Ultimately, the burden of persuasion rests with the plaintiff to show that he was subjected to sex discrimination, or to retaliation for his protected activity. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000).

Here, the district court held that Williams' retaliation and discrimination claims failed at step one of the *McDonnell Douglas* framework, namely, that Williams failed to establish prima facie cases of retaliation and discrimination. However, because we may affirm the district court's judgment on any grounds apparent from the record, *U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 375 (4th Cir. 2015) (citation omitted), we turn directly to the final two requirements of the *McDonnell Douglas* framework after assuming, without deciding, that Williams has established prima facie cases of discrimination and retaliation.

Under the first of these two final steps, we consider whether the County has met its burden of producing evidence of a legitimate, nondiscriminatory or nonretaliatory basis for firing Williams. *See Haynes*, 922 F.3d at 223. The answer here clearly is "yes." The record is unrefuted that Fairfax County articulated legitimate, nondiscriminatory, and nonretaliatory reasons for this adverse employment action: (1) the results of two investigations conducted by the County, which revealed serious deficiencies in Williams' work performance; and (2) Williams' substandard handling of the drug addiction case. So, we proceed to consider the final requirement of the *McDonnell Douglas* framework.

Under that final step, Williams had the burden of showing that there was a material dispute about whether the County's reasons for firing him were pretextual. To show pretext, Williams needed to demonstrate that the County's reasons for firing him were false and that retaliation and/or discrimination was one reason for the County's action. *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015); *Strothers*, 895 F.3d at 328. Williams could do so by demonstrating that the County's "'proffered nondiscriminatory reasons for the termination [were] inconsistent over time, false, or based on mistakes of fact.'" *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 652 (4th Cir. 2021) (quoting *Haynes*, 922 F.3d at 225). If Williams were able to identify such evidence, summary judgment would not be proper and the case would need to be determined by a trier of fact. *Haynes*, 922 F.3d at 225. However, Williams could not meet his burden of showing that the County's rationale was pretextual "by focusing on minor discrepancies that [did] not cast doubt on the explanation's validity, or by raising points that [were] wholly irrelevant to it." *Hux v. City of Newport News*, 451 F.3d 311, 315 (4th Cir. 2006).

11

We hold that Williams has failed to show that the County's reasons for firing him were pretextual.  We reach this conclusion after considering Williams' two primary arguments.[3]  First, Williams argues that the County did not have a legitimate reason to fire him because he had a good history of performing his job well, and he should have been given additional counseling or other opportunities to improve necessary job skills.  Second, Williams generally alleges that his termination letter contained numerous inaccurate representations.  As an example, Williams references a statement in the letter that his supervisor required Williams to receive additional coaching in November 2019, while Williams maintains that he initiated the request for additional support.

Neither of Williams' arguments is persuasive.  Williams' first contention that he should have received additional counseling lacks merit because it misperceives the pretext inquiry.  In analyzing pretext, we do not determine whether the County's reasons for firing Williams were "wise, fair, or even correct." *Dugan v. Albemarle Cty. Sch. Bd.*, 293 F.3d 716, 722 (4th Cir. 2002).  Nor do we scrutinize the disciplinary decisions made by his employer in this context. *See Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 901 (4th Cir. 2017) (citing *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)).  Instead, we confine our consideration to the reasons the County gave for firing Williams, and since there is no evidence of discrimination or retaliation, we decline to second-guess the County's decision to take this action rather than to take disciplinary action short of termination. *See DeJarnette*, 133 F.3d at 299 (explaining that a court in a Title VII action

---

[3] Williams raises various other arguments on appeal, which we reject as lacking merit.

12

"does not sit as a kind of super-personnel department weighing the prudence of employment decisions" made by employers charged with employment discrimination (citation omitted)).

Williams' second contention regarding pretext is that certain non-material statements in the County's termination letter were incorrect. But such an argument fails because it is merely an attack on "minor discrepancies that do not cast doubt" on the County's explanation for his firing. *Hux*, 451 F.3d at 315. Crucially, Williams does not directly challenge the reasons for his firing. Nor does Williams claim that the County's reasons for firing him have changed over time. Given these deficiencies in his position, Williams' argument concerning non-material discrepancies in the termination letter is insufficient to establish pretext. *See id.*

In sum, we hold that the record does not provide a basis for a jury to conclude that Fairfax County's reasons for firing Williams were pretextual. Williams has not carried his burden to show that he was subjected to sex discrimination or to retaliation for his protected activity. *Reeves*, 530 U.S. at 143.

III.

Accordingly, we affirm the district court's judgment in favor of the County.

*AFFIRMED*

13