**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 21-1998**

─────────────

JUSTIN BROWN,

        Plaintiff - Appellant,

     v.

SHERRY BRATTON; CHARLES COPPER; JAMES EASTLAND; BRYAN NORTH; COUNTY COMMISSIONERS OF CAROLINE COUNTY,

        Defendants - Appellees.

─────────────

Appeal from the United States District Court for the District of Maryland, at Baltimore. J. Mark Coulson, Magistrate Judge. (1:19-cv-01450-JCM)

─────────────

Argued: September 14, 2022                     Decided: November 30, 2022

─────────────

Before KING, AGEE, and THACKER, Circuit Judges.

─────────────

Affirmed by unpublished per curiam opinion.

─────────────

**ARGUED:** Ashton Zylstra, HANSEL LAW, P.C., Baltimore, Maryland, for Appellant. Jason L. Levine, LOCAL GOVERNMENT INSURANCE TRUST, Hanover, Maryland, for Appellees. **ON BRIEF:** Cary Johnson Hansel, III, HANSEL LAW, P.C., Baltimore, Maryland, for Appellant.

─────────────

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Justin Brown ("Appellant"), who is Black, alleges his former employer, County Commissioners of Caroline County, Maryland (the "County"), and his immediate supervisor, James Eastland ("Eastland") (collectively "Appellees"), subjected him to various acts of discrimination, harassment, retaliation, and unequal treatment during his employment.[1]   The district court granted summary judgment to Appellees on all of Appellant's employment claims.  Appellant argues the district court erred in concluding Appellees' actions did not create a racially hostile work environment and that Appellant did not sufficiently establish his equal protection claims.

For the reasons set forth below, we hold that the district court correctly concluded Appellant failed to demonstrate evidence of an equal protection violation or provide admissible evidence of a racially hostile work environment for which liability may be imputed to his employer.  Therefore, we affirm the district court's order granting summary judgment to Appellees.

I.

A.

Appellant was hired by the County's Department of Public Works as a Level I Motor Equipment Operator ("MEO I") on January 3, 2014.  As an MEO I, Appellant was responsible for various tasks, including cutting grass, digging holes, and picking up debris.

---

[1] Appellant's employment terminated due to unrelated medical issues and had no relation to the claims made in this case.

2

Appellant was one of approximately eight employees assigned to work in the "South Crew," which handles issues arising in the southern portion of Caroline County. Appellant was one of two Black employees assigned to the South Crew. At the time Appellant was hired, Eastland directly supervised all members of the South Crew. Eastland, in turn, was supervised by Bryan North ("North"), the Road Superintendent. Eastland and North are both white males. Shortly after Appellant was hired, Charles Copper ("Copper"), who is Black, became head of the Department of Public Works.

Appellant did not report -- nor does he complain of -- any discriminatory acts or hostile conditions during his first year of employment in 2014. Appellant's allegations of racial discrimination and a hostile work environment relate to incidents occurring between 2015 and 2017.

In October 2015, Appellant sought promotion to both the Level II Motor Equipment Operator ("MEO") II and Level III Motor Equipment Operator ("MEO III") positions. In addition to Appellant, two white individuals applied for the MEO III position: Richard Kinnamon ("Kinnamon") and Eric Thrift. The MEO III position required a Maryland Class "A" commercial driver's license ("CDL") and two years of experience at the MEO II level. At the time, neither Appellant nor Kinnamon was fully qualified for promotion to MEO III. Appellant possessed a Class "A" CDL; however, he did not have two years of experience as an MEO II. And while Kinnamon did not possess a Class "A" CDL, he had 13 years of experience with the County. Ultimately Kinnamon was promoted to the MEO III position and given six months to obtain his CDL. Copper, who made the hiring decision in consultation with North, explained during his deposition that "[s]eniority made the

3

difference. Color of the skin had nothing to do with the decision we made. It was seniority." J.A. 583.[2] On October 7, 2015, Appellant was promoted to MEO II. Eastland remained his immediate supervisor.

Beginning in 2015, Appellant complained to North that he was not being provided the same overtime opportunities offered to other County employees. According to Appellant's deposition testimony, "MEO Is never really got called [for overtime]. It was mainly MEO IIs and MEO IIIs and crew leaders." J.A. 99. Appellant also stated that overtime "depend[ed] on where you lived" and the employee's availability when needed. *Id.* Because overtime work typically required employees to clear potentially dangerous or harmful situations, such as a downed tree, it was the County's policy to call the closest employee so that such conditions could be cleared before someone was injured. Copper testified, "As far as overtime was concerned, it really depended on how close you lived to work because when we had an emergency[,] we had to get people in as soon as we could." *Id.* at 579–80.

After Appellant complained about the lack of overtime, North raised the issue with Eastland. In response, Eastland claimed that he had previously called Appellant with overtime opportunities, but Appellant did not answer. For his part, Appellant maintained that Eastland had never called him for overtime and offered to provide North with his phone records. North testified that Appellant did show him "a piece of paper, a single sheet of paper, with a list of phone numbers down the middle of it . . .. That's all it showed." J.A.

---

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

491. Eastland's number did not appear on the list. To rebut Appellant's version of events, Eastland showed North his phone. North testified that, on viewing Eastland's phone, he observed at least two instances where Eastland's phone "had [Appellant's] number" demonstrating Eastland "called, [or] tried to call" Appellant. *Id.* at 492. North did not recall the length of the calls or whether Eastland left a voicemail. However, he "believe[d]" the calls were placed "after normal work hours." *Id.* at 493. North testified he then directed Eastland to "please try to call [Appellant] when you can, to use him." *Id.* at 494.

B.

On March 9, 2016, County employees Christopher Peach ("Peach") and Dean Davidson ("Davidson") engaged in a conversation, with Appellant standing approximately 15 feet away. Appellant could not hear the conversation, but portions of this exchange were later relayed to him by Davidson. Appellant testified that Peach, in speaking to Davidson, said something to the effect of "if my daughter ever dated an African American, a n***** . . . [I] would kill him." J.A. 92. On March 10, 2016, Appellant reported this incident to North. Appellant informed North that Peach's comment made him uncomfortable. Although North asked what Appellant had done to provoke Peach, North advised Appellant he would talk with Peach, nonetheless.

North ultimately reported the March 9, 2016 comment to Copper, who questioned Peach about the incident. Copper testified that Peach "confirmed that he made the comments, but [contended that] he wasn't talking to [Appellant]"; rather, he was having "a general conversation" with "a couple other guys in his crew." J.A. 559. Copper advised Peach that such behavior would "not be tolerated in the Public Works Department or in

5

Caroline County." *Id.* at 563.   Copper testified he "gave [Peach] an oral reprimand" and "told him nope, I'm not going to tolerate it, and if you do say it again, you will be punished." *Id.*

Eastland further testified that, on a separate occasion, Peach came into the shop "looking for [Eastland] because something had happened . . . and [Peach] was very upset and he used the N word when he was just telling [Eastland] what had happened." J.A. 330. On this occasion, Peach was referring specifically to Appellant.   For his part, Peach testified that he did not recall "what word [he] used," but that "if they said it, [he] must have used it." *Id.* at 769.  Appellant was not present when Peach made this comment, and the record is unclear as to when Appellant learned of this statement.  Appellant testified during his deposition that he "hardly worked with Peach" and did not detect any hostility from Peach. *Id.* at 94.

Additionally, according to Appellant's deposition testimony, on September 29, 2016, Eastland said he "was having a bad day and didn't want to be around black people." J.A. 133–34.  Although Appellant initially asserted he overheard this comment, he later confirmed that he had not, in fact, heard the comment directly.  Rather, the comment had been relayed to him by Davidson.  Appellant testified it was his understanding that after Eastland made this comment, Eastland sent him "alone . . . to cut tree branches and unclog a ditch in the rain in an area with exposed electrical wires." *Id.* at 133.  Eastland clarified that he sent Appellant to look for problem spots and report any such problems.  Appellant's answers to written discovery concede that he was not working alone.  Instead, "Initially

6

[Appellant] was working with Mr. Kinnamon who left early and Mr. Davidson was ultimately relocated [to assist Appellant] hours later." *Id.* at 800.

Appellant also points to a second occasion -- on an unidentified date in 2017 wherein Appellant allegedly overheard Eastland make this same comment again. Appellant testified that, when walking past Eastland and Peach, he heard Eastland say, "I do not want to be around black people." J.A. 166–67. Yet Appellant never identified this second utterance in his discovery responses, nor did he report this comment to anyone.

C.

On December 22, 2016, Appellant contacted the County's Director of Human Resources, Sherry Bratton ("Bratton"), to request a meeting. On December 28, 2016, Bratton met with Appellant, Copper, and North. During this meeting, Appellant described having "communication issues" with Eastland, explaining that Eastland made Appellant work alone and failed to provide Appellant with adequate instructions for completing tasks. Appellant did not mention Eastland's September 29, 2016 remark, being asked or required to perform dangerous or unsafe tasks, or being denied overtime opportunities. Instead, Appellant simply "reported that he got his assignments last from Mr. Eastland and that Mr. Eastland didn't like him." J.A. 881. When Bratton spoke with Eastland about Appellant's complaints, Eastland stated he had also perceived communication issues with Appellant and described several occasions where Appellant either ignored what Eastland was saying, became combative when asked to do something, or refused to acknowledge Eastland altogether.

7

In the aftermath of this meeting, beginning in January 2017, Human Resources instituted regular Friday meetings for Appellant, North, and Eastland in order to provide Appellant with the opportunity to discuss his concerns. Additionally, Eastland committed to providing Appellant with his work assignments first in the morning. However, Eastland testified that this arrangement "didn't end up working out" because Appellant "wasn't always the first one in the room and it just really didn't make sense to necessarily wait around for him" when others were already "there waiting for their assignment." J.A. 369. Therefore, this arrangement was discontinued after approximately one month.

However, the Friday meetings between Appellant, Eastland, and North continued. Monitoring the situation, Bratton held a meeting with Appellant. According to Bratton's testimony, when she asked for possible solutions to form a better working relationship between Appellant and Eastland, Appellant informed her, "the only way the working relationship would get better is if [Appellant's] skin color would change." J.A. 881–82, 925.

## D.

Appellant also complains of a number of alleged unsafe work conditions. According to Appellant, on January 25, 2017, Eastland assigned him to operate a new grader for the purpose of scraping roads. Appellant informed Eastland of two areas where he observed bulging in the tires of the grader. In response, Eastland informed Appellant that County mechanic Richard Breeding ("Breeding") had inspected the grader and advised that the grader was safe to operate. Appellant testified that he "knew this was unsafe from his training" but was instructed to take the grader and start scraping roads. J.A. 169–70.

8

Within approximately 25 minutes, and before Appellant could begin scraping, Copper contacted Appellant and directed him to return with the grader. When Appellant returned to the facility, he was confronted by North who claimed Eastland had instructed Appellant to remain in the facility. Appellant informed North he left the facility at Eastland's direction. However, North informed Appellant that, as an operator, Appellant should have known better than to leave with the equipment in its current state.

Per Appellant, a similar series of events occurred on August 16, 2017, when Appellant observed a small puncture in one of the tires of the grader. Eastland again advised Appellant that Breeding had inspected the grader, but shortly after leaving the facility, Appellant was contacted by Copper, who directed Appellant to bring the grader back because it was unsafe to operate. Appellant returned, and the tire was replaced.

On February 24, 2017, Eastland directed Appellant to remove a plow from one of the graders. As a matter of safety, County employees do not perform this task alone. For this reason, Eastland advised Appellant that he would assist him. After waiting approximately two hours, Appellant radioed Eastland, who confirmed he was on his way to assist Appellant. But, instead of waiting for Eastland to arrive, Appellant removed the plow with the assistance of another individual.

On October 17, 2017, Eastland directed Appellant to change the grader blades. This task is ordinarily completed by two people and is regarded as a mechanic's job. However, Appellant did not request assistance and began to perform the job alone. Another employee observed him and stopped to assist. Appellant concedes he was not told to complete this

9

task alone. Rather, he testified, "[w]ho else is going to do it? If [Eastland] tells me to do it, who else is going to do it?" J.A. 188.

E.

On May 16, 2019, Appellant filed a complaint alleging 15 causes of action including claims against the County and against Bratton, Copper, Eastland, and North in their personal and official capacities. On February 21, 2020, the district court dismissed all claims against Bratton, North, and Copper leaving only the following claims: (1) hostile work environment pursuant to 42 U.S.C. § 1981, as to Eastland in his personal capacity; (2) racially hostile work environment pursuant to 42 U.S.C. § 2000e *et seq.* ("Title VII"), as to the County; (3) race discrimination -- only on the theory of alleged failure to promote -- pursuant to Title VII, as to the County; (4) equal protection violation pursuant to 42 U.S.C. § 1983 and the Maryland Declaration of Rights ("MDR"), as to all Appellees; and (5) hostile work environment pursuant to the Maryland Fair Employment Practices Act ("MFEPA"), as to the County.

On January 20, 2021, Appellees moved for summary judgment on the remaining claims. Appellees argued that Appellant failed to generate evidence of a racially hostile work environment, Appellant's non-promotion claim was time barred and had no substantive merit, and Appellant failed to establish an equal protection claim. On August 10, 2021, the district court granted summary judgment on Appellant's remaining claims.

In granting summary judgment on Appellant's hostile work environment claims, the district court found insufficient admissible evidence to demonstrate severe or pervasive harassment based, in part, on the temporal remoteness of the racially charged remarks. The

10

district court further held there was no basis for imputing liability to the County. Because the same analysis governs both Appellant's hostile work environment claims and Appellant's equal protection claims pursuant to federal and state law, the district court granted summary judgment on the same basis. Moreover, in granting summary judgment on Appellant's failure to promote claim, the district court held -- and Appellant acknowledged -- the matter was time barred.

Appellant filed a timely notice of appeal.[3]

## II.

We review a district court's grant or denial of summary judgment de novo, considering the evidence and viewing all reasonable inferences in the light most favorable to the nonmoving party. *Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 378 (4th Cir. 2022). We review the district court's determination regarding admissibility of evidence, for purposes of summary judgment, for abuse of discretion. *See Nader v. Blair*, 549 F.3d 953, 963 (4th Cir. 2008).

## III.

### A.

We begin our analysis with Appellant's hostile work environment claims. Appellant's hostile work environment claims pursuant to 42 U.S.C. § 1981 and the MFEPA are governed by the same analytical framework employed in Title VII hostile work

---

[3] Appellant does not challenge the district court's grant of summary judgment on his failure to promote claim pursuant to Title VII.

environment claims. *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (en banc) ("The same test applies to a hostile work environment claim asserted under 42 U.S.C. § 1981" as applied to a Title VII racially hostile work environment claim.); *Arsham v. Mayor of Baltimore*, 85 F. Supp. 3d 841, 849 (D. Md. 2015) ("Because the [MFEPA] is the state law analogue of Title VII, interpretation of [plaintiff's] claim under [MFEPA] is guided by federal cases interpreting Title VII.").

To survive summary judgment on his hostile work environment claims pursuant to Title VII, 42 U.S.C. § 1981 and the MFEPA Appellant "must show that there is (1) unwelcome conduct; (2) that is based on [his] . . . race; (3) which is sufficiently severe or pervasive to alter [his] conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Boyer-Liberto*, 786 F.3d at 277 (quoting *Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011)).

1.

As to the unwelcome conduct element, we agree with the district court that Appellant easily satisfied his burden based on multiple instances where Appellant voiced objection to the conduct he experienced. *See Strothers v. City of Laurel*, 895 F.3d 317, 328–29 (4th Cir. 2018) ("As this Court has repeatedly held, an employee can demonstrate that certain conduct is unwelcome simply by voicing [his] objection to the alleged harasser or to the employer.").

The record demonstrates that on March 10, 2016, Appellant complained that Peach's comment(s) made him uncomfortable. Additionally, in December 2016, Appellant requested a meeting with Human Resources. During the meeting, Appellant reported

12

receiving his assignments last and that Eastland did not like him.  Appellant subsequently informed Bratton, the Director of Human Resources, that the only way his working relationship with Eastland "would get better is if [Appellant's] skin color would change." J.A. 881–82.

Given this evidence, the district court did not err in concluding Appellant adequately demonstrated unwelcome conduct in the workplace.

2.

We turn next to an analysis of whether the unwelcome conduct was "because of" Appellant's race.  42 U.S.C. § 2000e-2(a)(1).  An employee is harassed or otherwise discriminated against because of his race if, "but for" the employee's race, he would not have faced such conduct.  *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 242 (4th Cir. 2002).  Thus, to survive summary judgment, Appellant must adduce sufficient evidence to demonstrate "that the harassing conduct was motivated by [racial] animosity."  *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 314 (4th Cir. 2008) (internal quotation marks omitted).  "[H]arassment due to personality conflicts will not suffice."  *Ziskie v. Mineta*, 547 F.3d 220, 226 (4th Cir. 2008).

The district court determined that, apart from the racially charged remarks made by Peach and Eastland, Appellant failed to show the unwelcome conduct was based on his race.  Specifically, the district court found Appellant "failed to carry his burden in establishing that, *because* of his race, [Appellant] (1) was not offered overtime opportunities . . . ; (2) was not promoted to the MEO III position; (3) was forced to work with unsafe equipment; (4) was directed to singlehandedly complete dangerous tasks

13

ordinarily reserved for two people; and (5) received his work assignments last." *Brown v. Bratton*, No. 1:19-cv-01450-JMC, 2021 WL 3510578, at *7 (D. Md. Aug. 10, 2021) (emphasis in original). We agree.

a.

While the parties dispute whether Eastland ever called Appellant with an opportunity to work overtime, the record is void of any evidence suggesting Appellant was denied this opportunity because of his race. Although Appellant did complain to North that he was not receiving overtime opportunities, Appellant never indicated this denial was because of his race. Additionally, after Appellant complained to North about the lack of overtime opportunities, the situation was addressed. Specifically, North instructed Eastland to "try to call [Appellant] when you can, to use him." J.A. 494. Even viewing the record in the light most favorable to Appellant, nothing apart from Appellant's opinions suggest Eastland refused to contact Appellant for overtime because of race. *See Mackey v. Shalala,* 360 F.3d 463, 469–70 (4th Cir. 2004) ("A plaintiff's own self-serving opinions, absent anything more, are insufficient to establish a prima facie case of discrimination.").

To the contrary, both Appellant and Eastland identify the County's policy as instructive on when and to whom overtime opportunities will be offered. Appellant concedes in his deposition, "MEO Is never really got called [for overtime]. It was mainly MEO IIs and MEO IIIs and crew leaders." J.A. 99. Additionally, Copper explained, "As far as overtime was concerned, it really depended on how close you lived to work because when we had an emergency[,] we had to get people in as soon as we could." *Id.* at 579–80.

14

b.

As to Appellant's claim that he was denied promotion to MEO III, neither Appellant nor Kinnamon was wholly qualified for this position. The MEO III position required a CDL and two years of experience at the MEO II level. Kinnamon had 13 years of experience with the County. And while Kinnamon did not have the required Class A CDL, he could -- and did -- obtain this licensure within six months of promotion. As for Appellant, although he did have a CDL, he applied for both the MEO II and MEO III positions in October 2015. Therefore, he could not have had the requisite years of experience in the MEO II position to achieve MEO III status. While Appellant argued other County employees had been promoted directly from an MEO I position to MEO III or higher, the record is undeveloped on this point. Without identifying specific instances and providing comparative evidence, such as the date of promotion, qualifications of the applicants at the time of promotion, or job description at the time of promotion, this assertion lacks sufficient support. Moreover, in reaching the decision to promote Kinnamon rather than Appellant, Copper testified "[s]eniority made the difference. Color of the skin had nothing to do with the decision we made." J.A. 583.

c.

The record compels the conclusion that Appellant was not required to work with unsafe equipment because of his race. In fact, Appellant has not presented evidence suggesting he was forced to work with unsafe equipment at all. Appellant reports he was instructed to utilize the grader, which he claims was in an unsafe condition, on two occasions. Both times, Breeding, the mechanic, had inspected the equipment for safety.

15

Moreover, on each occasion, Appellant was called back to the facility shortly after leaving and before he could begin utilizing the grader.

d.

Likewise, Appellant conceded that he was not instructed to complete a two-person job alone. *See* J.A. 175–76 (Q: Eastland "didn't say, for example, take the plow off and do it yourself, correct?" A: "No. We don't ever take plows off by ourselves."). As to the February 24, 2017 incident, Eastland informed Appellant he would come and assist him with removing the snowplow. Appellant then confirmed, via radio, that Eastland intended to provide assistance. But instead of waiting for Eastland's assistance, Appellant chose to undertake this task and received assistance from another employee. As to the October 17, 2017 incident, Appellant conceded that Eastland never directed him to change the blades by himself. Rather, Eastland merely directed Appellant to change the blades, and Appellant set out to complete this task on his own, never asking Eastland or anyone else for assistance. *See id.* at 187–88 (Q: "[D]id Mr. Eastland direct you to change the grader blade by yourself . . . or did he simply say change the grader blades? A: Change the grader blades."). And while Appellant was changing the grader blades, another employee stopped and assisted.

e.

When Appellant complained during the Human Resources meeting that Eastland gave him his assignments last, he described the issue as one of "communication." J.A. 157. Following the meeting, Copper directed Eastland to provide daily assignments to Appellant first. But Eastland testified that this practice lasted only a month as Appellant

16

was not always the first to arrive and "it just really didn't make sense to necessarily wait around for him to come in when there was [sic] people already there waiting for their assignment." *Id.* at 369.  During oral argument, Appellant argued that providing him with work assignments first was also discriminatory because he was allegedly being segregated based on his race.  However, Appellant conceded that there is nothing in the record supporting -- or even making -- this assertion.  Oral Argument at 2:36–45, *Brown v. Bratton,* No. 21-1998 (4th Cir. Sept. 14, 2022), http://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments (hereinafter "Oral Argument").

f.

With respect to Eastland's conduct, as outlined in detail above, the district court properly concluded that Appellant failed to offer sufficient evidence demonstrating unwelcome conduct "because of" his race.  Although Appellant suggested to Bratton that the only way his working relationship with Eastland "would get better is if [Appellant's] skin color would change," Appellant himself attributed Eastland's conduct to "communication issues" and proffered no evidence that it was because of his race other than his own conclusory allegations and subjective belief.  J.A. 881–82.

Nevertheless, the district court properly determined that certain statements were racially motivated.  The district court concluded that Peach's March 9, 2016 comment that "if my daughter ever dated . . . a n*****, [I] would kill him", J.A. 91, and Eastland's September 29, 2016 remark that he "didn't want to be around black people," *id.* at 133–34 constitute the sort of direct proof of discrimination necessary to satisfy the second element of a hostile work environment claim for purposes of summary judgment.  We agree.

17

3.

"The third element of a hostile work environment claim requires that the offending conduct be 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Strothers*, 895 F.3d at 331 (quoting *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir. 2003)). The district court concluded Appellant failed to clear this bar. The district court identified two instances of unwelcome conduct based on Appellant's race: (1) Peach's March 9, 2016 comment; and (2) Eastland's September 29, 2016 remark. As to Peach's second use of the N-word in a conversation with Eastland, the district court explained it did "not weigh heavily in the hostile work environment analysis" because Appellant did not hear the remark, and the record was unclear as to how or when Appellant learned about the remark or what effect it had on his work environment. *Brown,* 2021 WL 3510578, at *9. The district court did not identify, or evaluate the admissibility of, Eastland's 2017 statement that he "do[es] not want to be around black people." J.A. 166–67. Ultimately, the district court held only Peach's March 9, 2016 comment was supported by admissible evidence.

a.

"While a party may support its position on summary judgment by citing to almost any material in the record, the party's reliance on that material may be defeated if 'the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.'" *Whittaker v. Morgan State Univ.,* 524 F. App'x. 58, 60 (4th Cir. 2013) (quoting Fed. R. Civ. P. 56(c)(2)). Therefore, we must evaluate the admissibility of Appellant's evidence and determine whether the district court abused its discretion.

18

In his discovery responses, Appellant asserts he overheard Peach make the March 9, 2016 comment. However, Appellant testified during his deposition that he did not actually hear the comment. *See* J.A. 123 (Appellant testifying, "I didn't hear the comment, no."). Rather, Appellant learned of Peach's comment from Davidson.

In reviewing the district court's admissibility ruling for abuse of discretion, we conclude the district court did not abuse its discretion in ruling that the March 9, 2016 comment was admissible. Pursuant to Federal Rule of Evidence 801(c), hearsay is a statement "the declarant does not make while testifying at the current trial or hearing; and a party offers in evidence to prove the truth of the matter asserted in the statement." So long as Appellant does not intend to offer Peach's March 9, 2016 comment for the truth of the matter asserted (i.e., to prove Peach would kill a Black man for dating his daughter), the statement is being offered solely to demonstrate it was uttered at all. *See United States v. Cantu,* 876 F.2d 1134, 1137 (5th Cir. 1989) ("If the significance of a statement lies in the fact that it was made, rather than in the veracity of the out-of-court declarant's assertion, the statement is not hearsay because it is not offered to prove the truth of the matter asserted." (internal quotation marks omitted)). Therefore, the district court was correct to deem Peach's March 9, 2016 comment admissible.

Next, we review the admissibility of Peach's second use of the N-word. At that time, Peach was upset with Appellant and, in describing to Eastland what had upset him, Peach used the N-word to refer to Appellant. The district court did not determine the admissibility of this statement; instead, it concluded the statement did not factor heavily into its analysis of Appellant's claim because Appellant did not personally hear it.

19

However, Eastland confirmed during his deposition that Peach "came into the shop looking for [Eastland] because something had happened where [Appellant] had angered [Peach] and [Peach] came in and [Peach] was very upset and [Peach] used the N word when [Peach] was telling [Eastland] what had happened." J.A. 330. Additionally, Peach did not deny making the comment but testified, "I don't remember what word I used, but . . . if they said it, I must have used it." *Id.* at 769. If Peach testifies inconsistently at trial, this statement is not hearsay and will be admissible. *See* Fed. R. Evid. 801(d)(1)(A) (providing that a statement is not hearsay when "[t]he declarant testifies and is subject to cross-examination about a prior statement, and the [prior] statement is inconsistent with the declarant's testimony and was given under penalty of perjury . . . in a deposition"). Moreover, this is another instance where the statement may be offered to demonstrate it was uttered at all -- as opposed to being offered for the truth of the matter asserted. Therefore, we deem this statement admissible.

As to the admissibility of Eastland's September 29, 2016 remark that he "didn't want to be around black people," J.A. 133–34, Appellant states in his discovery responses that he heard Eastland make this remark. However, during his deposition, Appellant clarified that he did not actually personally hear this remark. *See id.* at 136 (Q: "Based on what you told me, is it fair to say that you did not hear that, that Mr. Davidson told you that he heard that, correct? A: Correct."). Unlike the March 9, 2016 comment, it is difficult to discern how this statement would be introduced if not to demonstrate truth, i.e., that Eastland "did not feel like being around any black people." *Id.* 136. The district court held this remark to be of little value "because the record contains no admissible evidence to

20

support it." *Brown v. Bratton*, No. 1:19-cv-01450-JMC, 2021 WL 3510578, at \*9 (D. Md. Aug. 10, 2021).   Appellant offers no refutation as to Appellees' contention that this comment presents itself in the record only as double hearsay, nor does he offer a basis for admissibility.   Without more, we will not disturb the district court's ruling as to admissibility and hold the district court did not abuse its discretion in deeming this statement inadmissible.

As to Eastland's 2017 remark, the district court did not evaluate admissibility. Appellant claims he "himself heard Eastland say that, which is obviously admissible." Appellant Reply Br. 15, n.2.   However, simply overhearing a statement does demonstrate admissibility. During oral argument, Appellant did not address admissibility as to this specific remark. Rather, Appellant asserted generally that all statements were admissible, either as non hearsay, as excited utterances, or for their effect on Appellant.   On review, we deem Eastland's 2017 remark -- that he "do[es] not want to be around black people", J.A. 166–67, to be admissible non hearsay. *See* Fed. R. Evid. 801(d)(2)(A) (an opposing party's statement is not hearsay when it is "offered against an opposing party and was made by the party in an individual or representative capacity"). Here, Eastland is a defendant and former supervisor for the County.   Thus, this statement was made in Eastland's individual or representative capacity and is being offered against he and the County. *Id.*

In sum, the record supports three separate admissible statements, that is, the two statements made by Peach and Eastland's 2017 remark.

b.

We next evaluate whether the three admissible statements we have identified are sufficiently severe or pervasive to create a hostile work environment. As we have previously explained, the severe or pervasive element "requires a showing that 'the environment would reasonably be perceived, and is perceived, as hostile or abusive.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Thus, the third "element has both subjective and objective components." *Ocheltree*, 335 F.3d at 333. Appellant must demonstrate both components to thwart summary judgment.

"[I]f the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993). Here, Appellant demonstrates he subjectively perceived the work environment to be hostile and abusive as he reported Peach's March 9, 2016 comment to North the next day.

Turning to the objective component, Appellant has failed to demonstrate an objectively severe or pervasive hostile or abusive work environment based on race. Whether an environment is objectively hostile or abusive is "judged from the perspective of a reasonable person in the plaintiff's position." *Boyer-Liberto*, 786 F.3d at 277. In determining "whether harassment is objectively abusive, courts must examine the totality of the circumstances." *Strothers*, 895 F.3d at 331. To assist in determining if conduct was objectively severe or pervasive, we consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. The bar for demonstrating conduct was objectively severe or pervasive is a high one. *See Perkins v. Int'l Paper Co.,* 936 F.3d 196, 208 (4th Cir. 2019) ("[R]ude treatment by [coworkers], callous behavior by [one's] superiors, or a routine difference of opinion and personality conflict with [one's] supervisor, are not actionable under Title VII." (quoting *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315–16 (4th Cir. 2008) (alterations in original)).

As to frequency, over the course of nearly five years working for the County, Appellant points to three admissible statements constituting unwelcome conduct based on race: (1) Peach's March 9, 2016 comment; (2) Peach's second separate use of the N-word; and (3) Eastland's 2017 statement. *See Hopkins v. Balt. Gas & Elec. Co.*, 77 F.3d 745, 753–54 (4th Cir. 1996) (noting that a few discriminatory incidents occurring "intermittently over a seven-year period, with gaps between incidents as great as a year . . . suggests the absence of a condition sufficiently pervasive to establish Title VII liability"), *abrogated on other grounds by Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020).

In evaluating severity, we look to the language utilized. On two occasions Peach utilized the N-word, which we have expressly held "is pure anathema to African-Americans." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001). "Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet . . . by a supervisor in the presence of his subordinates." *Id.* (quoting *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993)). We acknowledged even "an isolated incident of

23

harassment can amount to discriminatory changes in the terms and conditions of employment, if that incident is extremely serious." *Boyer-Liberto*, 786 F.3d at 277 (internal quotation marks omitted). However, we have also recognized that "a single act of harassment may not be actionable on its own." *Id.* And the "mere utterance of an . . . epithet which engenders offensive feelings in an employee[] does not sufficiently affect the conditions of employment to implicate Title VII." *Id.* (quoting *Harris*, 510 U.S. at 21).

Appellant relies on our decision in *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264 (4th Cir. 2015) in attempt to support his allegation that the unwelcome conduct was severe or pervasive. In *Boyer-Liberto,* we held a supervisor's two uses of racially charged language, made to the plaintiff's face, and accompanied by a threat to fire her, were sufficient to support the severe or pervasive element. *Id.* at 268. In contrast, here, none of the three comments were made directly to Appellant. Indeed, Appellant confirmed he did not hear Peach, a co-worker and not a supervisor, make either of the offensive comments. And Appellant does not suggest Peach's March 9, 2016 comment, or Eastland's 2017 comment, was made about or otherwise directed at him.

While the racially disparaging statements made by Peach and Eastland are reprehensible and abhorrent, they were isolated and remote in time. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 787 n.1 (1998) (concluding that to be deemed objectively pervasive, the "harassment must be more than episodic; [it] must be sufficiently continuous and concerted") (quotation marks omitted). Moreover, Appellant was not threatened with the loss of his employment. And Appellant did not report Eastland's 2017 remark or otherwise adduce evidence to demonstrate this statement interfered with his work

24

performance, despite continuing to work for the County for nearly two years following the last incident of alleged harassment.

Therefore, we agree with the district court in holding that, in this case, the alleged conduct was insufficiently severe or pervasive to create a hostile work environment.

4.

The fourth element of a hostile work environment claim requires a basis for imputing liability to the employer. *See Strothers*, 895 F.3d at 332 (*citing Boyer-Liberto*, 786 F.3d at 278). Different standards exist for evaluating the conduct of a co-worker versus a supervisor.

a.

An employer may be liable where the victim is harassed by a co-worker only when the employer "knew or should have known about the harassment and failed to take effective action to stop it." *Strothers*, 895 F.3d at 333 (alteration in original) (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013)). Effective corrective action means discipline that is reasonably calculated to end the behavior. Here, the County took corrective action as to Peach. Specifically, Copper verbally reprimanded Peach for using racially charged language, stating that such behavior "will not be tolerated in the Public Works Department or in Caroline County." J.A. 563. And there is no evidence of Peach using the N-word -- or similar language -- following the reprimand. Oral Argument at 3:02–4:06 (The court: "I thought the record indicated, tell me if I'm wrong, but once the [Appellant] complained about [Peach's comments] and the employer counseled Peach there was not repetition of that." A: "So, your honor, there isn't anything in the record to show any further incidents

25

past March 2016 specifically with those comments."). *See Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 499 (4th Cir. 2015) (recognizing that "the effectiveness of an employer's actions remains a factor in evaluating the reasonableness of the response"). Therefore, we agree with the district court in holding the County responded with appropriate remedial action reasonably calculated to end Peach's conduct and that, in this context, liability may not be imputed to the County for Peach's comments.

b.

As to Eastland's 2017 remark, we must look to the standard for imputing conduct of a supervisor to the employer. Where "the harasser is a supervisor, then the employer may be either strictly or vicariously liable for the supervisor's actions." *Strothers*, 895 F.3d at 333 (citing *Vance*, 570 U.S. at 431). However, where no adverse employment action is taken, "a defending employer may raise an affirmative defense to liability . . . subject to proof by a preponderance of the evidence. *Faragher*, 524 U.S. at 777–78. To prevail, the employer must demonstrate: (1) "that the employer exercised reasonable care to prevent and correct promptly any [racially] harassing behavior, and [(2)] that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer." *Id.* at 778. The County has shown the exercise of reasonable care to prevent and promptly correct harassment. As outlined above, upon Appellant's reporting, the County verbally reprimanded Peach causing the alleged discriminatory comments to cease. Additionally, the record clearly demonstrates that Appellant had the ability to report Eastland's behavior -- as he previously reported their

26

communication issues -- but failed to take advantage of this preventative or corrective opportunity. Therefore, we conclude liability may not be imputed to the County.

## B.

Appellant's equal protection claims pursuant to § 1983 and the MDR are governed by the Title VII analysis set forth above. *See Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir. 1994) (citation omitted) ("Courts may apply the standards developed in Title VII litigation to similar litigation under § 1983."). Accordingly, because the district court did not err in granting summary judgment on Appellant's hostile work environment claims, Appellant's equal protection claims likewise fail.

## IV.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*