**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 23-2232**

---

DON GORDON; TERRELL JONES,

　　　　　Plaintiffs - Appellees,

　　v.

SERGEANT WILLIAM C. HEATH,

　　　　　Defendant - Appellant,

　　and

MARYLAND STATE POLICE; CORPORAL JASON OROS,

　　　　　Defendants.

---

Appeal from the United States District Court for the District of Maryland, at Baltimore. George L. Russell, III, Chief District Judge.  (1:22-cv-01699-GLR)

---

Argued:  March 17, 2026　　　　　　　　　　　Decided:  June 24, 2026

---

Before KING, GREGORY, and THACKER, Circuit Judges.

---

Affirmed by published opinion.  Judge Gregory wrote the opinion, in which Judge King and Judge Thacker joined.

---

**ARGUED:**  Sydney M. Patterson, MARCUSBONSIB, LLC, Greenbelt, Maryland, for Appellant.  Joseph Eugene Spicer, COHEN HARRIS, LLC, Towson, Maryland, for Appellees.  **ON BRIEF:**  Bruce L. Marcus, MARCUSBONSIB, LLC, Greenbelt, Maryland, for Appellant.

---

GREGORY, Circuit Judge:

Don Gordon and Terrell Jones are two Black officers formerly assigned to a multi-agency Maryland State Police ("MSP") drug task force. From the outset of their tenure, they allege they were treated as outsiders: they describe being excluded from informal meetings and group communications where overtime work and more desirable job opportunities were circulated to white Task Force members.

According to their Amended Complaint, the harassment peaked in early June 2020, when a supervisor circulated a text message with a racially coded and sexually explicit image of George Floyd to Task Force officers. This text was sent in the immediate wake of Floyd's killing and the nationwide controversy that followed. Gordon and Jones allege Defendant Sergeant Heath, who co-led the unit, participated in the exclusionary practices and failed to address the racially charged text message.

Gordon and Jones brought this action against MSP and their supervisors, including Sergeant Heath, asserting, among other claims, hostile work environment under Title VII and 42 U.S.C. § 1981 (the latter enforced through 42 U.S.C. § 1983 as to the individual defendants). The district court granted the motions to dismiss in part and denied them in part, dismissing the race discrimination claims but allowing the Title VII hostile work environment claim to proceed against MSP and the § 1981 hostile work environment claims to proceed against Sergeant Heath and Corporal Oros in their individual capacities, and denying qualified immunity.

In this interlocutory appeal, Sergeant Heath challenges that denial of qualified immunity. He contends that the Amended Complaint fails to plausibly allege his personal

2

involvement in the racially hostile work environment described therein and, in any event, that the law was not clearly established at the time of the alleged conduct. Accepting the Amended Complaint's well-pleaded allegations as true and drawing reasonable inferences in Gordon's and Jones's favor as we must, we find that Plaintiffs have plausibly alleged Sergeant Heath's participation in and tacit authorization of a racially hostile work environment, and that the right at issue was indeed clearly established at the time. We therefore affirm.

## I.

The following sets forth allegations of harassment and a hostile work environment as are pled in Plaintiffs-Appellees Amended Complaint.

### A.

#### 1.

Plaintiffs Don Gordon and Terrell Jones are Black law enforcement officers who joined Maryland State Police's ("MSP") multi-agency Organized Crime Drug Enforcement Task Force, also known as "Baltimore Strike Force Group 7" ("the Task Force"), in 2019—Jones in April of that year and Gordon in October. Their day-to-day supervisors on the Task Force were Defendants Sergeant William C. Heath and Corporal Jason Oros. Those two co-led the unit, though Heath was senior in rank as a sergeant to Corporal Oros. Oral Ar. at 18:50–19:10 (timestamp). Sergeant Heath and Corporal Oros oversaw Plaintiffs' daily activity and had authority to set schedules, control how they worked within the unit, and remove them from the Task Force.

3

According to the Amended Complaint, the disparate treatment began early on. Within the first few months of their assignment to the Task Force, Gordon and Jones say they noticed that white Task Force members were treated more favorably. The Amended Complaint describes and sets forth the impact of the recurring disparate treatment: Sergeant Heath and Corporal Oros "rarely communicated" with them, while routinely holding informal meetings and sending group text messages that included white officers but excluded Gordon and Jones. J.A. 11 ¶ 50.[1] Those meetings and text chains were where the unit shared operational information and provided notice of new and ongoing investigations that Plaintiffs describe as "desirable job assignment opportunities and overtime work" that could result in additional compensation. *Id.* ¶ 51.

According to Plaintiffs the consequences were predictable: because they were left out of the channels where opportunities were circulated, they often learned about more desirable assignments and overtime work only after the fact by hearing other Task Force members talk about them when the opportunities were no longer available. They allege that this exclusion cost them overtime work opportunities that white Task Force members received, resulting in Plaintiffs' loss of income.

The Amended Complaint states that Sergeant Heath and Corporal Oros knew Plaintiffs were being left out, and Plaintiffs "discovered" that Sergeant Heath and Corporal Oros participated in the very text message threads that excluded them. J.A. 12 ¶ 61. In Plaintiffs' telling, the exclusion was not a one-off miscommunication but rather the ongoing way the

---

[1] Citations to the "J.A." refer to the joint appendix filed by the parties in this appeal.

unit operated—one that, by design and effect, advantaged white Task Force members and left Gordon and Jones on the outside.

2.

The Amended Complaint then describes a flashpoint that, in Plaintiffs' telling, put the racial subtext of their experience into sharp relief.

On May 25, 2020, George Floyd was killed in Minneapolis after a police officer knelt on his neck for about nine minutes as he pleaded that he could not breathe. *Key Events in the Month Since George Floyd's Death*, Reuters (June 25, 2020, 2:30 PM UTC), https://www.reuters.com/news/picture/idUSRTS3FNJP/;      https://perma.cc/SP97-QBDT (last visited June 24, 2026).  In the days that followed, the video showing Floyd's death and his last words were everywhere, on television, social media, and in everyday conversation, and they catalyzed a nationwide controversy over race and policing.  *Id.*

Against that backdrop, just over a week later, on June 2, 2020, Corporal Oros allegedly sent a "text message depict[ing] a superimposed nude African-American male with exposed and enlarged genitals sitting on George Floyd's head and neck area on the street near the rear bumper of a Minneapolis police car."  J.A. 13 ¶ 67.  Gordon and Jones allege they were "upset and offended" by the image.  *Id.* ¶ 73.

What matters for Plaintiffs' claim against Sergeant Heath is what Plaintiffs say should have followed the offensive text but never did:  Sergeant Heath failed to "properly supervise and discipline" Corporal Oros, failed to report the incident through MSP supervisory channels, and failed to start an investigation of the matter.  *Id.* ¶ 69.  Plaintiffs further allege that the nonresponse fit a broader pattern they had been living with—exclusion from the

5

unit's informal meetings and text threads, and the resulting denial of overtime work assignments, desirable job opportunities, and the attendant compensation received by white Task Force members.

Moreover, Plaintiffs allege that the combination of Corporal Oros's message and Sergeant Heath's nonresponse eroded the unit's day-to-day atmosphere, "result[ing] in more racial division within the Task Force," creating mistrust along racial lines, and leaving Plaintiffs feeling isolated from other members. *Id.* ¶¶ 68, 75–76. This tension went beyond mere discomfort because Plaintiffs alleged they did not believe other Task Force officers would protect them during dangerous street work they routinely performed, such as investigating crime, executing search and seizure warrants, and arresting suspects. J.A. 14 ¶ 77.

Jones left the Task Force in July 2020, shortly after the June 2020 incident. Gordon alleges he remained on the Task Force and continued to experience racial discrimination and a hostile work environment until the beginning of January 2022.

### B.

Gordon and Jones first took their claims to the U.S. Equal Employment Opportunity Commission ("EEOC"). On November 30, 2020, they filed charges of discrimination, and on April 13, 2022, they received right-to-sue letters. They filed this action in the District of Maryland on July 8, 2022.

After the initial complaint was met with motions to dismiss, Plaintiffs filed an Amended Complaint on February 7, 2023, which reset the pleadings and became the operative complaint. In it, they asserted five claims: Title VII race discrimination (Count One), Equal Protection race discrimination under § 1983 (Count Two), Title VII hostile

work environment (Count Three), § 1981 race discrimination (Count Four), and § 1981 hostile work environment (Count Five). Because Sergeant Heath and Corporal Oros are state actors, the § 1981 claims proceeded against them through § 1983. Sergeant Heath moved to dismiss and asserted qualified immunity as to the individual capacity claim against him.

On September 21, 2023, the district court granted the defense motions in part and denied them in part. The court dismissed Plaintiffs' race discrimination claims but allowed the hostile work environment claims to proceed against MSP under Title VII and against Sergeant Heath and Corporal Oros in their individual capacities under § 1981 through § 1983, while denying qualified immunity at the pleading stage. The district court explained that Plaintiffs had "narrowly charted" plausibility, relying primarily on the June 2, 2020, text message and related allegations of exclusion. *Gordon v. Maryland State Police*, No. CV GLR-22-1699, 2023 WL 6161089, at *9 (D. Md. Sept. 21, 2023).

Sergeant Heath noticed this interlocutory appeal on October 19, 2023, challenging only the denial of qualified immunity on the § 1981 hostile work environment claim against him.

## II.

Jurisdiction over an interlocutory appeal from the denial of qualified immunity is limited. Under 28 U.S.C. § 1291 and the collateral order doctrine, we may review the denial of qualified immunity to the extent the appeal "turns on an issue of law." *Mitchell v. Forsyth*, 472 U.S. 511, 526–27 (1985); *Iko v. Shreve*, 535 F.3d 225, 234 (4th Cir. 2008).

7

*Winfield v. Bass* explains the boundary: accepting the facts as the district court viewed them, we may decide whether the alleged conduct violated clearly established law, but we may not entertain arguments that the plaintiff "has not presented enough evidence" that the plaintiff's version occurred. 106 F.3d 525, 529–30 (4th Cir. 1997) (en banc). In short, no reweighing of facts is permitted on this interlocutory review.

The district court denied qualified immunity at the motion to dismiss stage, so our review is de novo. *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 685 (4th Cir. 2018). We accept the Amended Complaint's factual allegations as true and draw reasonable inferences in Plaintiffs' favor, but we do not credit legal conclusions, unwarranted inferences, or "naked assertions" without factual enhancement. *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017).

III.

Qualified immunity generally shields officials from liability unless their conduct violates clearly established law. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Courts apply a familiar two-step inquiry that asks (1) whether the facts alleged make out a violation of a constitutional right, and (2) whether the right was clearly established at the time of the alleged misconduct. *Pearson*, 555 U.S. at 232; *see also Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011). Although courts may address either prong first, *Pearson*, 555 U.S. at 236, this case is best approached by beginning with the merits because doing so frames the right at the appropriate level of generality for the "clearly established" analysis that follows.

8

The merits inquiry is shaped by the procedural posture of the case. At the motion to dismiss stage, the question is not whether Plaintiffs can ultimately prove their allegations, but whether they have plausibly alleged a constitutional violation and whether the asserted right was clearly established on the assumed facts. To state a § 1981 claim, Plaintiffs must plausibly allege that, but for race, they would not have suffered the loss of a legally protected right. *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 339 (2020). And because § 1981 requires intentional race discrimination, Plaintiffs must plead facts supporting a reasonable inference of discriminatory purpose that may be drawn from direct or circumstantial evidence. *Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).

With that posture in mind, we turn to whether the Amended Complaint plausibly alleges a racially hostile work environment attributable to Sergeant Heath under the governing elements.

## A.

Section 1981 guarantees that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The Supreme Court has construed § 1981 to prohibit intentional racial discrimination in contracting, including in the employment relationship. *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 609 (1987); *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459–60 (1975). Where, as here, the defendant is a state actor, "§ 1983 constitutes the exclusive federal remedy for

9

violation of the rights guaranteed in § 1981." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 731–33 (1989); *Dennis v. Cnty. of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995).[2]

In this Circuit, hostile work environment claims under § 1981 are "governed by the same principles" as hostile work environment claims under Title VII. *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001). For hostile work environment claims, *Strothers v. City of Laurel* supplies the element-by-element framework and the contextual lens for evaluating each element. 895 F.3d 317, 328–29 (4th Cir. 2018). Under that framework, the plaintiff must plausibly allege that the harassment was (1) unwelcome, (2) based on race, and (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere. *Id.*; *see also Spriggs*, 242 F.3d at 184; *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998).

One adjustment is required in this § 1983 individual capacity posture.[3] Title VII's separate "imputable to the employer" element is not the inquiry for personal liability under

---

[2] 42 U.S.C. § 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ." Section 1983 thus supplies the procedural vehicle through which § 1981 rights are enforced against state actors, making § 1983 the exclusive federal remedy for violations of § 1981 by state actors and requiring plaintiffs to proceed under § 1983 rather than directly under § 1981. *See Jett*, 491 U.S. at 731–33.

[3] In his opening brief, Sergeant Heath mistakenly includes an additional element of a hostile work environment claim—namely, that the discriminatory conduct must be "imputable to the employer." Op. Br. 9–10. That requirement applies to Title VII claims against an employing entity, but it is inapplicable here because Plaintiffs assert claims under 42 U.S.C. §§ 1981 and 1983 against individual defendants in their personal capacities. Under those statutes, liability is personal rather than vicarious. *See Ashcroft v.* (Continued)

§ 1983. Liability is personal, and Plaintiffs must plausibly allege that each defendant, through his own conduct, participated in or caused the deprivation. *See Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017) ("[L]iability will only lie where it is affirmatively shown that the official charged acted personally in the deprivation of the plaintiffs' rights.").

At this stage of litigation, the Court therefore asks whether, accepting the Amended Complaint's well-pleaded allegations as true and drawing reasonable inferences in Plaintiffs' favor, the alleged conduct plausibly states a racially hostile work environment under the Title VII/§ 1981 standard the Fourth Circuit applies. *See Strothers*, 895 F.3d at 328–31; *Spriggs*, 242 F.3d at 184.

1.

Sergeant Heath reads the "unwelcome conduct" element to require that a plaintiff directly confront the harasser or formally complain. But *Strothers* rejects that cramped view. The first element "is not a high hurdle," and this Court recognized two ways to show conduct was unwelcome—by voicing objection to the harasser or employer, or by the character of the conduct itself because "the nature of the conduct may indicate whether or not the conduct is unwelcome." *Strothers v. City of Laurel*, 895 F.3d 317, 328–29 (4th Cir. 2018); *see also EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 314 (4th Cir. 2008) (treating certain derisive conduct as inherently unwelcome when it is "difficult to see how any employee would welcome" it).

---

*Iqbal*, 556 U.S. at 677 ("Absent vicarious liability, each Government official . . . is only liable for his or her own misconduct."); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983). Accordingly, the "imputable to the employer" standard has no application to the individual capacity claims asserted here.

That second, more contextual approach matters because workplace dynamics do not always make immediate objection realistic. Particularly where, for example, the alleged harasser is a supervisor or where a supervisor is alleged to tolerate misconduct by a favored colleague, employees may reasonably fear retaliation or other consequences from speaking up—and, in a law enforcement setting, Plaintiffs plausibly allege that workplace mistrust can carry real safety implications in the field. J.A. 14 ¶ 77. *Strothers* does not make the viability of a hostile work environment claim turn on whether a plaintiff confronted their harasser; it only asks whether the conduct was unwanted and regarded as undesirable, which may be inferred from the allegations and circumstances. *Strothers*, 895 F.3d at 328–29.

At the pleadings stage, Plaintiffs' allegations satisfy that low bar. They allege exclusion from core communications and opportunities, and they allege receiving a text that contained an extremely offensive image of George Floyd. Against the widely understood context of George Floyd's killing by law enforcement, it is "difficult to see how any employee would welcome derisive behavior" invoking that event, especially two Black officers working within a law enforcement task force. *Sunbelt Rentals*, 521 F.3d at 314. Plaintiffs also allege in their Amended Complaint that they were "upset and offended" by Corporal Oros's text and Sergeant Heath's inaction. J.A. 13 ¶ 73. Taking those allegations as true and drawing reasonable inferences in Plaintiffs' favor, the Amended Complaint plausibly alleges that the conduct was offensive and unwelcome.

2.

When determining whether the allegedly hostile conduct occurred because of race, *Strothers* also supplies the framework.

12

Title VII (and the § 1981 hostile work environment framework that mirrors it) is not a "general civility code," and it targets only conduct that occurs "because of" race, evaluated with "appropriate sensitivity to social context." *Strothers*, 895 F.3d at 329–31. *Strothers* makes explicit that harassment need not come with a contemporaneous racial statement of animus every time: "the connection between animus and conduct may be inferred from the totality of the circumstances." *Id.* at 331; *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998) (instructing courts in harassment cases to apply "[c]ommon sense" and "appropriate sensitivity to social context" to the "constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed"). At this stage of litigation, even with § 1981's but-for requirement, *see Comcast Corp.*, 589 U.S. at 341, a plaintiff need not plead that every discrete act was overtly racial. The question is whether the allegations support a plausible inference that race explains the pattern.

Here, Gordon and Jones allege that, throughout their tenure, Sergeant Heath and Corporal Oros "rarely communicated with" them, J.A. 11 ¶ 50, and maintained informal meetings and text chains that circulated overtime work and desirable job opportunities to white members while excluding Gordon and Jones. They further allege that on June 2, 2020, Corporal Oros circulated a George Floyd image depicting "a superimposed nude African-American male with exposed and enlarged genitals sitting on George Floyd's head and neck area on the street near the rear bumper of a Minneapolis police car." J.A. 13 ¶ 67.

Viewed in its social context, that alleged image is not merely offensive; it is circumstantial evidence of racial animus. And under *Strothers*, allegations of racial animus

13

need not accompany each challenged act to support an inference that a broader pattern of facially neutral conduct occurred because of race. *See* 895 F.3d at 330–31. Thus, the alleged George Floyd image provides the kind of contextual showing that can "inject[]" race into the explanation for the exclusionary practices Plaintiffs describe and support an inference that those practices were not race-neutral at all. *Id.*; *see also id.* at 329, 334–36 (explaining that although much of the alleged mistreatment was not overtly race-specific, allegations that the supervisor wanted an employee "of a different race," together with the pattern of singling-out plaintiff, supported a reasonable inference that the harassment was "race-based").

### 3.

The third element asks whether the alleged harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Strothers*, 895 F.3d at 331 (internal citations omitted). Courts examine the "totality of the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *Strothers*, 895 F.3d at 331. What "interferes with work performance" or becomes "threatening" can look different depending on the job and setting, which is why context always matters. *Strothers*, 895 F.3d at 331. And while "[s]imple teasing, offhand comments, and off-color jokes" do not suffice, *EEOC v. Fairbrook Med. Clinic, P.A.*, 609 F.3d 320, 328 (4th Cir. 2010), even a single incident can meet the standard if "extremely serious." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d

14

264, 281, 285–86 (4th Cir. 2015) (en banc) (finding it reasonable for plaintiff to claim a hostile work environment when she was called a racial slur only twice, because "an isolated incident of harassment, if extremely serious, can create a hostile environment").

Viewed in the light most favorable to Plaintiffs, the Amended Complaint plausibly alleges much more than a stray slight. Plaintiffs describe ongoing exclusion from the informal meetings and group text chains where desirable assignments and overtime opportunities were discussed and distributed—exclusions they say caused them to miss potentially lucrative job and overtime work opportunities. They also allege the derisive incident in which Corporal Oros sent the racially and sexually offensive image of George Floyd, which even counsel for Sergeant Heath concedes is sufficiently severe because of its level of insensitivity and offensiveness. Oral Ar. at 10:50 (timestamp). Sergeant Heath took no corrective action— no reprimand, no report, no investigation—and continued excluding Gordon and Jones from informal meetings and text group chats. Plaintiffs allege that the combined conduct resulted in more racial division, created mistrust along racial lines, and left them isolated from other Task Force members.

Because of this mistrust, Plaintiffs alleged that their ability to do their job safely and effectively became compromised. They state in their Amended Complaint that because of the racially divisive and hostile atmosphere created within the Task Force, they did not believe Sergeant Heath, Corporal Oros, and other Task Force members would protect them in their dangerous street work that involved drug investigations and executing search and seizure warrants. At the pleading stage, these allegations go directly to *Harris*'s "physically threatening" and "interference with work performance" factors because a reasonable

15

officer could perceive as abusive an environment in which racial division and mistrust plausibly undermine the expectation of backup in the field. *Harris*, 510 U.S. at 23; *Strothers*, 895 F.3d at 331. Taking all these allegations together—repeated exclusion affecting opportunities and pay, a humiliating racially offensive text message, continued nonresponse by leadership, and alleged safety-threatening mistrust—Plaintiffs plausibly allege conduct sufficiently severe or pervasive to alter their conditions of employment. *Strothers*, 895 F.3d at 331; *Boyer-Liberto*, 786 F.3d at 285–86.

4.

Finally, we address personal liability and causation. This case proceeds against Sergeant Heath in his individual capacity, so § 1983's "no respondeat superior" rule means he is liable only for his own conduct, not Corporal Oros's. *Ashcroft v. Iqbal*, 556 U.S. 662, 676–77 (2009); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). Plaintiffs therefore must plausibly allege Sergeant Heath's personal involvement in the hostile environment through *his* participation in the challenged conduct, or through *his* acts or omissions that causally contributed to it. *Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017). They must also plausibly allege discriminatory intent. *Id.* And since Plaintiffs proceed under § 1981 principles, they additionally must satisfy causation requirements. *Comcast Corp.*, 589 U.S. at 339, 341 ("a § 1981 plaintiff first must show that he was deprived of the protected right and then establish causation—and that these two steps are analytically distinct," and to prove causation, plaintiff must "initially plead and ultimately prove that, but for race, they would not have suffered the loss of a legally protected right.").

16

So, Sergeant Heath is correct that a § 1981 claim requires a showing of intentional race discrimination, and *Iqbal* does caution that "knowledge and acquiescence" alone does not establish a defendant's discriminatory state of mind. 556 U.S. at 677, 683. But *Iqbal* does not foreclose a circumstantial showing of intent as Sergeant Heath suggests. That case expressly acknowledges that condoning discrete wrongs "could be the basis for some inference of wrongful intent," so long as the complaint plausibly connects the conduct to the defendant's discriminatory state of mind. *Id.* at 683.

That principle is reflected in this Court's supervisory-liability cases, which recognize that a supervisor's "indifference or tacit authorization" of a subordinate's misconduct can be a causal factor in the constitutional injury. *See Slakan v. Porter*, 737 F.2d 368, 372–73 (4th Cir. 1984); *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (supervisor liability where supervisor knew of a pervasive risk, responded with deliberate indifference/tacit authorization, and that response had an affirmative causal link to the injury). *See also Wilkins v. Montgomery*, 751 F.3d 214, 226–27 (4th Cir. 2014) (reaffirming *Shaw*'s "affirmative causal link" requirement); *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan* that supervisory indifference/tacit authorization may be a causal factor). Put differently, the tacit authorization of explicitly racial harassment may circumstantially provide a link between facially neutral conduct and an intent to violate a constitutional right.

Against that backdrop, Gordon and Jones plead two routes to Sergeant Heath's personal involvement. First, they allege participation: Sergeant Heath and Corporal Oros jointly supervised the Task Force and maintained informal meetings and group text threads

17

that excluded Plaintiffs while white members received work-related information and opportunities through those channels. Second, they allege purposeful nonresponse and tacit authorization: after Corporal Oros circulated the George Floyd image to the group, Sergeant Heath allegedly did not discipline Corporal Oros, report the incident through internal MSP channels, or initiate an investigation, and Plaintiffs allege Sergeant Heath continued to exclude them from informal meetings and text chains afterward.

To be sure, if Plaintiffs had alleged only that Sergeant Heath learned of Corporal Oros's conduct and failed to act, that would raise an *Iqbal* concern. 556 U.S. at 677, 683. But Plaintiffs allege more: they link Sergeant Heath's nonresponse in his ongoing supervisory role to his alleged participation in the exclusionary structure that Plaintiffs allege was race-based when viewed in context. On those combined allegations, Sergeant Heath's failure to report or respond is plausibly race-based, not because inaction automatically equals intent, but because it supports a reasonable inference of purposeful inaction that helped perpetuate the race-salient hostile work environment. *Slakan*, 737 F.2d at 372–73; *Shaw*, 13 F.3d at 799. In other words, Plaintiffs allege that Sergeant Heath's inaction in response to Corporal Oros's offensive text serves as circumstantial evidence that Sergeant Heath's exclusionary conduct before and after the text was sent was racially motivated. This circumstantial showing is sufficient at the pleadings stage. *Iqbal*, 556 U.S. at 683.

Accordingly, the Amended Complaint plausibly alleges that Sergeant Heath violated Gordon's and Jones's § 1981 rights (enforced through § 1983) by participating in and tacitly authorizing a racially hostile work environment. On Plaintiffs' account, the harassment was severe or pervasive enough to alter the conditions of their employment,

18

affecting not only compensation and opportunities, but also their ability to perform safely and effectively in the field. As alleged, Sergeant Heath's own conduct contributed to that environment both through his participation in the exclusionary practices and his failure to intervene in the face of overtly racial harassment.

B.

We now address whether the right Sergeant Heath is alleged to have violated was clearly established at the time. We conclude that it was, so qualified immunity is not available for Sergeant Heath at this stage.

A right is clearly established when existing precedent has placed the question "beyond debate," such that a reasonable official would understand the conduct to be unlawful. *al–Kidd*, 563 U.S. at 741 (2011); *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 313 (4th Cir. 2006). The inquiry does not demand a case "directly on point." *al–Kidd*, 563 U.S. at 741. Instead, it asks whether, in the circumstances at hand, the law gave a fair warning.

As has been discussed in depth, Plaintiffs identify as two Black officers, and they allege that from early on in their tenure on the Task Force, they were excluded from the informal meetings and group text chains where more desirable assignments and overtime opportunities were circulated to white officers. They also allege that in the immediate wake of George Floyd's killing and the national controversy that followed, Corporal Oros circulated to the group a demeaning image of George Floyd—and that Sergeant Heath, a co-leader with authority to act, did nothing and continued the same exclusionary practices toward Plaintiffs. On those assumed facts, the relevant question is whether a reasonable

19

supervisor in law enforcement would have understood that participating in and perpetuating such a racially hostile work environment by tacit authorization violates clearly established law. For the reasons below, we find that a reasonable supervisor would have.

This Court has recognized—notably in a policing context—that discriminatory mistreatment in a police unit can present through exclusion from the informal channels that structure day-to-day work. In *Campbell v. Galloway*, the plaintiff was one of only a few female officers on her unit and offered evidence suggesting she was treated differently by her team, including that the team "regularly had breakfast together" after night shift but she was "never invited," and that when a restaurant donated food to the department, her team members "ate it all without telling" her. 483 F.3d 258, 263 (4th Cir. 2007). When she later complained that there was "one set of rules for her and another for everyone else" and that her sergeant "did not back her up during calls as he did the male officers," her lieutenant understood her to be complaining about sexual harassment and elevated the matter to the Chief. *Id.*

Reaffirming that public employees' Equal Protection discrimination claims "mirror" Title VII and may be brought under § 1983, *id.* at 272 n.5., *Campbell* puts public supervisors on notice that discrimination in law enforcement settings can manifest through exclusion from informal team channels through which information and support flow, and differential treatment tied to operational backup can be evidence of discriminatory mistreatment, not merely social friction. This is plainly analogous to Plaintiffs' allegations of exclusion from the informal meetings and group texts where desirable assignments and

opportunities were distributed, and their allegation that the resulting mistrust affected their ability to work safely in the field.

This Court's hostile work environment cases also gave clear notice that supervisory authority may itself aggravate discriminatory harassment when those with authority ratify, reinforce, or fail to correct the misconduct. In *Boyer-Liberto v. Fontainebleau Corp.*, our en banc Court treated a supervisor's use of a dehumanizing "monkey" epithet as paradigmatically severe and "extremely serious," even though it occurred just twice within a short period. 786 F.3d at 280, 285–86 (4th Cir. 2015) (en banc) ("We reject, however, any notion that our prior decisions . . . were meant to require more than a single incident of harassment in every viable hostile work environment case."). The Court also emphasized that supervisory authority can amplify the severity of workplace harassment, particularly when those with authority reinforce or tolerate the discriminatory conduct: the harasser in *Boyer-Liberto* obstructed the plaintiff's attempt to report the misconduct, and when plaintiff later attempted to report the harassment to a general manager, the general manager validated the harasser's authority by identifying him as the plaintiff's "boss." *Id.* at 280 ("Properly considering that evidence, we must accept that [plaintiff] believed—and reasonably so—that [her harasser] could [take adverse action against plaintiff] that would be rubber-stamped by" managing authority).

That principle readily maps to the allegations here, where Plaintiffs say Corporal Oros, one of their supervisors, circulated racially dehumanizing imagery and Sergeant Heath, the other supervisor with authority to intervene, allegedly did nothing and continued the practices Plaintiffs say excluded them from opportunities.

21

A reasonable supervisor would likewise have been on notice that discriminatory harassment need not take the form of an explicit racial slur to be obviously unlawful when viewed in context. In *Beardsley v. Webb*, a male supervisor repeatedly directed sexually charged comments and advances at a female subordinate, culminating in his statement that it was his "turn" to "make out" with her and "have his way," even after she had protested the supervisor's behavior. 30 F.3d 524, 528–29 (4th Cir. 1994). Although *Beardsley* involved a different type of harassment, the principle does not depend on the protected trait at issue—it rests on notice. This Court held that the unlawfulness was apparent: "No male officer could reasonably have thought in 1992 that it was not sexual harassment to announce that it was his turn to make out with a woman who was subject to his command . . ." *Id.* at 531. *Beardsley* thus provides a qualified immunity principle that carries over to this case— when a supervisor's conduct (or tolerance of a subordinate's conduct)[4] is so plainly discriminatory in context that a reasonable officer would understand it to be unlawful harassment, qualified immunity is unavailable.

That same notice logic applies here, where Plaintiffs allege Sergeant Heath maintained an exclusionary structure disadvantaging the two Black officers and then, in the immediate wake of George Floyd's killing, tolerated the circulation of an unmistakably racially offensive image of Floyd without corrective action.

---

[4] Sergeant Heath argues that he had no "supervisory authority over" Corporal Oros. Op. Br. 11. That contention is incorrect as a matter of rank: consistent with the point made during oral argument, a sergeant is senior to a corporal within the Maryland State Police chain of command. Oral Arg. at 18:50–19:10 (timestamp).

Finally, a reasonable supervisor would have been on notice that discriminatory intent may be inferred from the cumulative context of workplace conduct, even when individual acts appear facially neutral in isolation. For instance, *Strothers v. City of Laurel* held that the "because of" inquiry must be assessed with sensitivity to "social context," and that "harassment need not be accompanied by a contemporaneous statement of animus"— the connection between animus and conduct "may be inferred from the totality of the circumstances." 895 F.3d at 329–31, 331. The facts of *Strothers* illustrate why that approach matters. The plaintiff there, a Black woman, alleged that from "day one" she was singled out for constant surveillance, badgering, and scrutiny by her supervisor—conduct that could be described as race-neutral in isolation. *Id.* at 324. But when she complained, the department director disclosed that the supervisor "wanted someone of a different race," which, the Court explained, "injected" race into the explanation for the mistreatment and gave the plaintiff reason to think race was relevant. *Id.* at 323, 330.

This Court in *Strothers* also emphasized additional contextual facts supporting that inference: Strothers was the only Black subordinate employee; the supervisor's only two Black subordinates were the only employees she had ever disciplined or reported; and former Black employees warned of a history of similar treatment. *Id.* at 323–26. And importantly for the clearly established analysis, this Court rejected the district court's choice to adopt "the most charitable interpretation" for the employer and treating race as "coincidental," explaining that at the relevant stage the factfinder could infer discrimination from the full context rather than isolated acts. *Id.* at 330.

23

That is the same lens Plaintiffs invoke here. Even if exclusion from meetings and group texts could be described as facially neutral in isolation, *Strothers* makes clear that a reasonable supervisor would understand that once race-salient facts enter the picture, the law does not assess whether the pattern is "because of" race by looking to whether every discrete act contains an explicit slur, but rather by looking to the context and the totality of the circumstances surrounding the pattern.

Taken together, these authorities leave "no legitimate question" that a reasonable MSP supervisor would have understood that continuing to exclude the only two Black officers from career-advancing communications and opportunities, while failing to respond to an overtly race-coded text message in the wake of a nationally consequential event, violates clearly established law. *Korb v. Lehman*, 919 F.2d 243, 247 (4th Cir. 1990).

IV.

Accepting the well-pleaded allegations as true and drawing reasonable inferences in Plaintiffs' favor, the Amended Complaint plausibly alleges that Sergeant Heath participated in and tacitly authorized a racially hostile work environment in violation of § 1981 (enforced through § 1983), and that the right at issue was clearly established at the time. Accordingly, the district court's denial of qualified immunity is

*AFFIRMED.*

24